589 F.2d 1370
 26 UCC Rep.Serv. 94
 Philip B. RITZAU and Pamela Ritzau, his wife, Plaintiffs-Appellees,
v.
WARM SPRINGS WEST, Robert L. Brown, Jr. and Cornelia Brown,
his wife, Defendants-Appellants.
Philip B. RITZAU and Pamela Ritzau, his wife, Plaintiffs-Appellees,
v.
Frederick W. KIMBALL, Defendant-Appellant.
Philip B. RITZAU and Pamela Ritzau, his wife, Plaintiffs-Appellees,
v.
Richard W. LOMAS and Jeanne Lomas, his wife, Defendants-Appellants.
Philip B. RITZAU and Pamela Ritzau, his wife, Plaintiffs-Appellees,
v.
John C. ALBERTSON, Gayle P. Albertson, his wife, and Peter
Flood,Defendants-Appellants.
 Nos. 76-1284, 76-1605, 76-1530 and 75-3258.
 United States Court of Appeals,
Ninth Circuit.
 Jan. 29, 1979.
 
 Richard H. Greener, Jack S. Gjording, John C. Ward, Boise, Idaho, for defendants-appellants.
 James K. Norman, Auburn, Cal., for plaintiffs-appellees.
 Appeal from the United States District Court for the District of Idaho.
 Before BROWNING, CHAMBERS and SMITH,* Circuit Judges.
 J. JOSEPH SMITH, Circuit Judge:
 
 
 1
 These are four consolidated appeals by defendants from a judgment of the United States District Court for the District of Idaho, J. Blaine Anderson, Judge, in a securities act, negotiable instruments, contract and fraud action by investors in a real estate development. We affirm in part, reverse in part and remand.
 
 
 2
 The complete factual background of this controversy as found by the district court, as to which there is little dispute, is set forth as Appendix A. We will summarize here the facts most pertinent to this appeal.
 
 
 3
 In 1968, appellants Robert L. Brown, Dr. Richard Lomas and John C. Albertson undertook a ski resort development. They organized and became sole stockholders of a corporation, Calico Enterprises, Inc. ("Calico"), which managed the building of the project through a wholly-owned subsidiary, Calico Construction and Development, Inc. ("Calico Construction"). A partnership of these three individuals and their wives,[1] Warm Springs West ("W.S.W."), took title to the land subject to a purchase money mortgage. As the project progressed, parcels of land were from time to time deeded by W.S.W. to Calico, mortgaged to financial institutions to secure construction loans and reconveyed to W.S.W. Later, appellant Frederick W. Kimball and two individuals not involved in this action were brought in to provide additional financing for furnishings and equipment through Enterprises of Sun Valley ("E.S.V."). They were made directors of Calico and given the right in case of default by Calico to name a majority of its board.
 
 
 4
 In 1970, plaintiff Philip B. Ritzau became interested in entering into a business venture in the ski country of the Western United States. As a result, he and a friend, appellant Peter Flood, began discussions with Albertson and Brown. In June, Flood joined Calico as a hotel manager and executive vice president. On December 10 and 11, 1970 Ritzau and his wife concluded an agreement to buy into the project, which was already going sour, contracting to purchase Albertson's 10% Share in Calico, Calico Construction and W.S.W. at a cost of $75,000. An original proposal that Ritzau purchase Albertson's share directly from Albertson was changed at Ritzau's request to provide for purchase by Ritzau from Calico and W.S.W. Ritzau also agreed to work as "construction manager" on the project.
 
 
 5
 Ritzau paid the agreed $75,000 in several installments. Notes were signed by Brown individually and on behalf of Calico and W.S.W. as security for the amount paid by Ritzau. Of the $75,000, $50,000 went to Albertson, but $25,000 was used up in the project and never reached Albertson. Ritzau never received Albertson's stock, and the articles of partnership were not amended to reflect any change of membership. Ritzau subsequently brought this action to recover his $75,000.
 
 
 6
 The district court, in its second amended judgment from which these appeals were taken, found Albertson, Brown, Flood, Calico, Calico Construction and W.S.W. liable to Ritzau for violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. This liability was based on failure to disclose that the actual reason for Albertson's sale was distrust of Brown, failure to disclose that the Calico books omitted substantial payables and failure to disclose the default control provisions of the E.S.V. lease. The court also found Brown, Calico and W.S.W. liable on the notes signed by Brown, and Calico and W.S.W. liable for breach of contract. Lastly, the court found that Albertson, Brown, Lomas, their wives and Kimball were individually responsible as partners for the liability incurred by W.S.W.
 
 
 7
 Judgment was entered for the sum of $75,000 against all appellants (except that Calico's liability on the notes was limited to $25,000), for an additional amount of $7,500 for attorney's fees against those found liable on the notes, with interest at 6% From March 21, 1971 to date of judgment and thereafter at 8%, and for costs.I.
 
 
 8
 Appellant Kimball has moved to dismiss the appeals of Flood and Lomas on the ground that they have entered into agreements of settlement with the Ritzaus. Flood and Lomas have not withdrawn their appeals, and the terms of the covenants and agreements are not before us. Plaintiffs do not deny and Flood and Lomas admit that money has been paid by and covenants entered into with Flood and Lomas not to sue on or execute any judgments against them in this action. In view of the possible effect on rights of Kimball, Flood and Lomas to contribution or indemnity in actions presently pending in state courts, however, this court may retain jurisdiction of their appeals. Bank of Marin v. England, 385 U.S. 99, 101, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966). The motion to dismiss the appeals of Flood and Lomas is denied.[2]
 
 II.
 
 9
 The principal issues on appeal are the sufficiency of the evidence to support the findings of membership of Kimball in the partnership, of the scope of authority of Brown to bind the partnership and of the capacity in which signers became liable on the notes; the sufficiency of the findings on the § 10(b) and Rule 10b-5 claim to meet the standards of Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), decided subsequent to the decision below; the identity of the parties liable for breach of contract; and the measure of damages for breach of contract.
 
 III.
 
 10
 The findings as to failure to disclose and materiality of the three items (1) that the real motivation for the sale was distrust of Brown, (2) the omission of the payables from the books, and (3) the control provisions of the E.S.V. lease, as well as the findings as to execution of the notes and breach of the contract to deliver the agreed interests to the plaintiffs, are all supported by substantial evidence in the record and are not clearly erroneous. The finding of membership of Kimball in the W.S.W. partnership is likewise supported in the record.
 
 IV.
 
 11
 We are not satisfied that the findings and conclusions, drawn in the light of the flexible duty standard we adopted in White v. Abrams, 495 F.2d 724 (9th Cir. 1974), support the judgment of liability under § 10(b) and Rule 10b-5. We must remand for reconsideration of this issue under the standards since established by Ernst & Ernst v. Hochfelder, supra, 425 U.S. 185, 96 S.Ct. 1375.
 
 
 12
 The district court's reliance on the "flexible duty" standard of White v. Abrams was well placed at the time of decision, but the Supreme Court has since explicitly rejected that standard in Ernst & Ernst v. Hochfelder,supra, 425 U.S. at 193 n. 12, 96 S.Ct. 1375, a rejection binding on us. We must apply the law as it is at the time of our decision in this case, not as it was or appeared to be at the time of the decision below.
 
 
 13
 Hochfelder has made it plain that recovery under § 10(b) requires "some element of scienter and cannot be read to impose liability for negligent conduct alone," Id., at 201, 96 S.Ct. at 1385. "Scienter" is defined as "intent to deceive, manipulate or defraud," Id., at 193, 96 S.Ct. at 1381. The Court has left open the question whether under some circumstances recklessness might furnish a basis for a finding of the requisite intent, Id., at 193-94 n. 12, 96 S.Ct. 1375. However, the court below made no finding as to the existence of the necessary intent as to any of the appellants and we must therefore reverse the finding of liability based on violation of § 10(b) and Rule 10b-5.[3]V.
 
 
 14
 The district court held Kimball liable as a general partner of W.S.W. The record shows that on February 20, 1970 Brown and Kimball entered into an agreement whereby Brown would sell or assign to Kimball "as a limited partner, a 25% Interest in Warm Springs West" in exchange for $300,000 of financing. On March 20, 1970 Brown and Kimball agreed that Kimball would be admitted to W.S.W. as a limited partner and signed an addendum to the W.S.W. Articles of Partnership purporting to admit Kimball as a limited partner under a provision in the partnership agreement granting Brown very broad powers in the administration of the affairs of the partnership. On September 17, 1970 Lomas wrote to Brown that he had never been advised "as to the financial and business relationship with Mr. Fred Kimball" and he requested that Albertson and he be compensated for this and other of Brown's activities. On October 29, 1970 Albertson wrote to Brown that the "reluctant sale" of his interest in W.S.W. was brought about because Brown had made decisions "without telling me exactly of the nature of the effect on the partnership and in this regard I cite the additional partnerships of Fred Kimball and Peter Flood." The general ledger of W.S.W., kept by Brown, contains an entry in the amount of $1.00 dated December 31, 1970 "To Record Kimball."
 
 
 15
 Ritzau made the final payment for his interest in W.S.W. on March 12, 1971. Ritzau testified that he first learned of the addendum to W.S.W.'s Articles of Partnership "in March or April of 1971 . . . maybe even later than that," that he first learned of the March 20, 1970 agreement, "sometime in March of April of 1971," and that he first learned of the February 20, 1970 agreement between Brown and Kimball at the March or April, 1971 meeting of the board of directors of Calico. The March, 1971 meeting was held on March 17, 1971.
 
 
 16
 On May 14, 1971 Kimball wrote to Brown's attorney referring to the March 20, 1970 agreement and requesting that a "limited partnership interest . . . be promptly delivered to me."
 
 
 17
 The consent of each existing partner in a partnership is necessary for the admission of a new partner, Burnet v. Leininger, 285 U.S. 136, 139-40, 52 S.Ct. 345, 76 L.Ed. 665 (1932), absent a provision in the partnership agreement providing otherwise. The W.S.W. partnership agreement authorizes the admission of a general partner upon the written consent of each partner and the contribution of $60,000. Neither of these conditions was met. The partnership agreement, however, also contains a provision which gives Brown very broad powers of administering the affairs of W.S.W. This provision did not in words authorize Brown to admit limited partners to W.S.W. However, Brown along with Kimball signed an addendum purporting to admit Kimball as a limited partner to the W.S.W. partnership pursuant to this provision. It may be inferred from the letters of Lomas and Albertson that Lomas and Albertson believed that Brown had admitted Kimball under authority of this provision. Since the members of the partnership evidently construed this provision to give Brown authority to admit Kimball as a partner, we conclude that Brown had the necessary authority under this provision to admit Kimball as a partner and that Kimball was admitted as a partner to the W.S.W. partnership.
 
 
 18
 The district court held Kimball liable as a general partner of W.S.W. because a certificate of limited partnership was never filed. The court cited our decision in Vidricksen v. Grover, 363 F.2d 372 (9th Cir. 1966), where we held, as a matter of California law, that plaintiff's failure to renounce his interest in a partnership until six months after he learned he might be liable as a general partner because of failure to file a limited partnership certificate prevented plaintiff from avoiding liability as a general partner of the partnership pursuant to section 11 of the Uniform Limited Partnership Act ("the Act"), adopted as § 15511 of the Corporations Code of California. Implicit in our holding was that, as a matter of California law, failure to file a certificate of limited partnership would result in liability as a general partner unless one was exempted by the provisions of § 11 of the Act.[4] The Supreme Court has instructed that § 11 "ought to be construed liberally, and with appropriate regard for the legislative purpose to relieve from the strictness of the earlier statutes and decisions." Giles v. Vette, 263 U.S. 553, 563, 44 S.Ct. 157, 161, 68 L.Ed. 441 (1924). And the Act itself provides that "(t)he rule that statutes in derogation of the common law are to be strictly construed shall have no application to this chapter." Idaho Code § 53-228(1).
 
 
 19
 The district court found that Kimball claimed he was a limited partner in W.S.W. and that he did not renounce this interest. We may infer from these findings that Kimball believed he was a limited partner in W.S.W.
 
 
 20
 There is no indication in the court's findings that Kimball received any distribution of profits from the partnership, and the other findings would seem to make it quite certain that none were earned or distributed. There were therefore none to return in connection with a renunciation. Nor is there any finding that he exercised rights beyond those of a limited partner. The court, however, found that he never did disclaim an interest as general partner and that he was thoroughly knowledgeable about the formation of limited partnerships.
 
 
 21
 Kimball's letter to Brown (Exhibit 22) limited his claim to a partnership interest to that of a limited partner. It might be argued that this is a sufficient disclaimer in these circumstances to meet the requirements of the statute and to distinguish this case from Vidricksen, where no renunciation of general partnership interest was made until six months after Vidricksen had been advised that he might be considered a general partner. One great difficulty is, however, that the letter went solely to Brown and that on March 20, 1970, at the time Kimball signed the third addendum to the partnership articles of W.S.W. purporting to make him a limited partner, he was aware that there was a question whether it would be necessary to recast the original articles in order so to limit his relationship to the entity.[5] Moreover, Kimball was quite active in the project. He prevented Ritzau from exercising shareholder's rights in Calico because the transfer of interests had not been completed.
 
 
 22
 We must, of course, give considerable deference to an Idaho trial judge's feel for Idaho law. The court's conclusion that an Idaho court would apply Idaho law in this situation in the same manner in which we interpreted and applied California law in Vidricksen is entitled to great weight. United States v. Pollard, 524 F.2d 808, 810 (9th Cir. 1975); Owens v. White, 380 F.2d 310, 315 (9th Cir. 1967).[6] While the issue is close, we cannot find error in the conclusion that Kimball was liable as a general partner.
 
 VI.
 
 23
 Calico, W.S.W. and Brown were held liable on notes issued to secure the undertaking to transfer to plaintiffs the Albertson shares in Calico and his shares of the W.S.W. partnership. The notes were admitted into evidence as Exhibits 10A-10E. Each was signed in similar fashion on three lines at the lower right of the face of the instrument, in the following manner:
 
 
 24
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 25
 In Exhibit 10A, dated December 11, 1970, the body of the note contained a promise by Calico Enterprises, Inc., a corporation and (written in) Warm Springs West, a partnership, to pay $50,000 to Ritzau's order on or before February 11, 1971. Calico undertook to pay attorney's fees. In Exhibit 10B, dated February 5, 1971, the expressed promise was by Calico Enterprises, Inc., a corporation, the amount $10,000 and attorney's fees, the due date April 5, 1971. In Exhibit 10C, dated February 11, 1971, the expressed promise was by Calico Enterprises, Inc., a corporation, the amount $50,000 and attorney's fees, the due date March 11, 1971. In Exhibit 10D, dated February 19, 1971, the expressed promise was by Calico Enterprises, Inc., a corporation, the amount $10,000 and attorney's fees, the due date April 19, 1971. In Exhibit 10E, dated March 12, 1971, the expressed promise was by Calico Enterprises, Inc., a corporation, and/or Warm Springs West, a partnership, the amount $5,000 and attorney's fees, the due date May 12, 1971.
 
 
 26
 On May 25, 1971, shortly before instituting proceedings under the Bankruptcy Act, the board of Calico voted unanimously "that (the) outstanding notes of Phil Ritzau . . . be approved based upon a review by the Board of the notes that they are debt not equity."Calico, W.S.W. and Brown maintain they are not liable on the notes because they received no consideration. W.S.W. and Brown additionally claim they are not liable on the notes because of a novation worked by the board's approval of the notes as a debt. We find these contentions without merit. According to Idaho law, "any consideration which would be sufficient to uphold an ordinary contract would be sufficient to validate a promissory note." Hallowell v. Turner, 94 Idaho 718, 720, 496 P.2d 955, 957 (1972). "The waiver of a right or forbearance to exercise the same is a sufficient consideration for a contract, whether the right be legal or equitable, or exists against the promisor or a third person, provided it is not utterly groundless." McMahon v. Auger, 83 Idaho 27, 38, 357 P.2d 374, 380 (1960). Calico, W.S.W. and Brown each benefited by Ritzau's willingness to accept the notes in lieu of present delivery of the stock and partnership articles. Approval of the notes as debt by the board of Calico cannot, of itself, discharge W.S.W. and Brown. To discharge the debt, it must be shown that Ritzau agreed to a release. See Allen Steel Supply Co. v. Bradley, 89 Idaho 29, 37, 402 P.2d 394, 398 (1965). No such evidence has been presented. Nor can we find any intent to discharge the original $50,000 note (Exhibit 10A) upon execution of the renewal note (Exhibit 10C).
 
 
 27
 W.S.W. and Brown also assert they are not liable on some of the notes because, with respect to these notes, they are endorsers, not makers, and because no presentment and dishonor was made. They rely on Idaho Code § 28-3-402 which provides that "(u)nless the instrument clearly indicates that a signature is made in some other capacity it is an indorsement." The comment to this section states, however, that "by long established practice judicially noticed or otherwise established a signature in the lower right hand corner of an instrument indicates an intent to sign as the maker of a note or the drawer of a draft." Idaho courts have not had occasion to apply this section of the Uniform Commercial Code or its predecessor provisions, §§ 17(6) and 63 of the Uniform Negotiable Instruments Law. However, courts in a number of other states have held such signers to be makers. E. g., Schaeffle v. Nolan, 115 Cal.App.2d 651, 252 P.2d 732 (1953); Peterson v. Swanson, 259 Ill.App. 80 (1930); Bankers Trust of South Carolina v. Culbertson, 268 S.C. 564, 235 S.E.2d 130 (1977); Germania National Bank v. Mariner, 129 Wis. 544, 109 N.W. 574 (1906). Contra, La Caisse Populaire Credit Union v. Cross, 293 Mass. 190, 199 N.E. 548 (1936); O'Dess v. Gunter, 258 Mich. 667, 242 N.W. 804 (1932).
 
 
 28
 Particularly in light of the comment to § 28-3-402 quoted above, we agree with the district court that the location of the signatures on the notes in suit clearly indicates that the signatures were made in the capacity of makers and that the Idaho courts would so rule.
 
 VII.
 
 29
 Albertson, Brown and Ritzau agreed that Ritzau should pay $75,000 for Albertson's shares of Calico and W.S.W., that the transfer should be from Albertson to the entities and from the entities to Ritzau, and that delivery of 10% Interests in the entities should be made upon receipt by Albertson of the full payment. Ritzau paid the full amount, but the last $25,000 never reached Albertson. Brown's use of those funds to support the failing project rather than to complete the payment to Albertson was a breach of the contract for which the entities, Calico and W.S.W., for which Brown acted, were held responsible. Calico now contends that it was barred by Idaho law from purchasing its own stock while insolvent and that the contract as to it was therefore void. However, the issue of Calico's solvency at the time the contract was entered into was not raised in the pretrial order nor tried or determined. We need not therefore pass upon it here. The contract was within Brown's authority acting for both parties.
 
 
 30
 A contention is made that the contract was carried out. We are puzzled by this claim, for we are directed to no evidence, nor have we found any, that any stock in Calico or any articles of partnership in W.S.W. were ever delivered to the Ritzaus under the contract. As we have noted, Ritzau was barred by Kimball from participating in a corporate meeting because no transfer of interests had taken place.
 
 
 31
 There remains the question of the measure of damages for breach. It is contended that at the time for performance, interests in both entities were worthless. Such a finding might have been sustainable, but there was before the court evidence that the parties considered the entities then viable and had set the amount of the security for performance at $75,000, the amount paid contemporaneously by Ritzau. We cannot say that a valuation and finding of damages in that amount is clearly erroneous.
 
 
 32
 The judgments on the notes and for breach of contract against defendants as entered in the second amended judgment appear to be free from error, and are affirmed.
 
 
 33
 The judgments of liability for violation of § 10(b) and Rule 10b-5 are reversed and remanded for new trial.
 
 APPENDIX A
 
 34
 The plaintiff Philip B. Ritzau and his wife, Pamela Ritzau, prior to December 1, 1970, were residents of the State of California and thereafter were residents of the State of Idaho. During all relevant times herein, Doctor Richard Lomas and his wife, Jeanne Lomas, John C. Albertson and his wife, Gayle P. Albertson, Frederick W. Kimball and Charles Mertel were all residents of the State of Washington. William R. White, during all relevant times herein, was a resident of the State of Arizona. Peter Flood, until June, 1970, was a resident of the State of California, and thereafter was a resident of the State of Idaho. Robert L. Brown and Cornelia Brown, his wife, were at all relevant times herein residents of the State of Idaho. No evidence has been introduced at the trial of this matter as regards the participation of Cornelia Brown, Jeanne Lomas and Gayle Albertson, Similarly, the plaintiff, Pamela Ritzau took no part in the transactions or events leading up to this lawsuit.
 
 
 35
 Defendant Robert Brown, possessing a business background in real estate development and restaurant management, created Calico, which was designed as a resort condominium and hotel operation in the ski country of Sun Valley and Ketchum, Idaho. Toward the end of 1968, Calico Enterprises, Inc. was formed and destined to be the sales and administrative entity for the venture with its shareholders, Robert Brown, Richard Lomas and John Albertson. Calico Construction and Development, Inc., a wholly-owned subsidiary of Calico Enterprises, was set up for bookkeeping convenience and became the construction entity with the aforesaid shareholders. Warm Springs West (WSW), a general partnership existing under the law of Idaho between Brown, Lomas and Albertson, was formed with the aim of purchasing the land and leasing the same to Calico Enterprises. John Albertson has a business background in sales and was, for a time, a stockbroker. Richard Lomas is a doctor and his business background appears limited.
 
 
 36
 At the outset, money was borrowed to start construction of phase one, consisting of 18 condominium units which were completed in early 1970, together with the start of lodge construction. More money was borrowed and the second phase saw the completion of the Calico Lodge in September, 1970, and completion of 42 additional condominium units by January, 1971. The third phase, which envisioned 60 condominium units and a small convention center, never materialized.
 
 
 37
 Early in 1970, Philip Ritzau, then employed as a construction engineer in California, together with Peter Flood, an employee of Western International Hotels in San Francisco, and close friends since college, contemplated entering into a business venture together, to be located in the mountain ski country of western United States. Plaintiff traveled in early 1970 looking for investment prospects by talking to realtors and gathering sales literature in Alta, Utah, and in Colorado at the ski areas of Aspen, Snowmass at Aspen, Vail and Steamboat Springs, and lastly, to Jackson Hole, Wyoming. Ritzau thought the latter was the best for a condominium hotel-type development and, capitalizing on his engineering background, performed some construction cost estimates for a tract of land located in Jackson Hole, while Flood, capitalizing on his hotel background, did some planning in that regard. Philip Ritzau, an engineer, had experience in subdivision layout and construction, had taken two courses in accounting in college, and had assisted in his father's men's clothing store business by initiating account collection procedures. Ritzau had in the past purchased a small amount of stock and had some acquaintance with balance sheets and profit and loss statements. Ritzau was not attuned to the world of finance and marketing, nor with the nature of stock ownership, equity and corporate organization fundamentals and debt concepts. Although no babe in the woods, Philip Ritzau's knowledge and actions bear out the fact that he was not a sophisticated investor.
 
 
 38
 In February, 1970, Ritzau and Flood traveled to Sun Valley, Idaho, to investigate condominium development and met Brown and Albertson. They were given a tour of the facilities and received some sales literature about Calico condominium prices. Brown and Albertson were enthusiastic as the first phase of development was being completed, and Albertson told Ritzau and Flood that prospective profits were good because the cost of the condominiums could not compare with the projected selling price of the same. Brown's role was portrayed as that of financial manager, while Albertson's primary concern was sales. Neither Brown nor Albertson solicited investment, nor did Flood or Ritzau offer to invest, but rather merely indicated their interest.
 
 
 39
 Flood became more interested in Calico and eventually joined the operation in June of 1970, as hotel manager and executive vice president. In September, 1970, plaintiff was alerted to the possibility of an opportunity to participate in Calico, as Flood placed an interstate phone call to Ritzau in California and stated that Albertson might be on his way out because Flood and Brown were dissatisfied with Albertson's sales performance. In October Flood called again and said that Albertson's interest was for sale, whereupon plaintiff traveled to Boise, Idaho, and was flown to Ketchum by Brown.
 
 
 40
 On this first visit, plaintiff met with Brown and Flood and received some condominium sales and financial information. Brown stated at this meeting that condominium sales were on target and that the project was on schedule. This information was conveyed, despite the fact that Ritzau had been told Albertson was not doing a good job with sales. The principals of Calico were not discussed. Brown stated that plaintiff was to take John Albertson's interest, which was a 10% Interest in Calico Enterprises, Calico Construction and Development and Warm Springs West, and the price of Albertson's interest was discussed. Albertson asked for $90,000.00; however, Brown balked at the asking price and stated that he would sell his own interest in Calico for $75,000.00. There is no evidence that Brown intended to sell his interest; nevertheless, the statement seriously damaged Albertson's bargaining power and from that time forward, the three parties treated the price of Albertson's interest as $75,000.00.
 
 
 41
 Ritzau returned to Calico in late October and had discussions with Brown and Flood, wherein Ritzau was informed that the principals of Calico were Albertson, Lomas and Brown. Brown stated that Flood was to become a partner with a 10% Interest and that Ritzau was to take over Albertson's 10% Interest and assume the role of construction superintendent.
 
 
 42
 Plaintiff's next contact occurred at a November 20, 1970, Board of Directors meeting held at the Calico Lodge. Although previously the interests of Calico principals, Frederick Kimball and William White, partners in Enterprises of Sun Valley, were not mentioned, however, at this meeting William White and Dave McGrath, representatives of Enterprises of Sun Valley (ESV), were in attendance, together with Albertson and Flood. Brown introduced Ritzau to the board as Albertson's replacement. At this time, plaintiff received additional investment information, including a profit and loss statement, budget and forecast, cash flow projection, sales literature, articles of incorporation of Calico Enterprises, and a copy of the Warm Springs West partnership agreement, but without the third addendum showing the limited partnership interest of Frederick Kimball.
 
 
 43
 The meeting of the minds as regards Ritzau's purchase of Albertson's interest occurred by December 1, 1970. Ritzau had decided to accept the offer to join Calico and moved his family to Ketchum on December 1, 1970, with the view toward assuming the role of investor, director in Calico Enterprises, partner in Warm Springs West, and construction superintendent at a salary determined by Brown to be $1,500.00 per month. However, prior to moving to Ketchum and after obtaining the financial documents heretofore stated, Ritzau consulted an attorney and accountant in California and would later seek to effectuate a change in the terms of purchase.
 
 
 44
 On December 10 and 11, 1970, Ritzau met with Lee Schlender, attorney for Calico, Brown and Flood in order to finalize the agreement to purchase Albertson's interest. Ritzau revealed that he had been advised by his attorney to take his interest from the corporation instead of purchasing directly from Albertson, and refused to sign an "Agreement of Sale and Release" listing the seller as Albertson and Ritzau as purchaser. The "Agreement of Sale and Release" was therefore changed to reflect that Warm Springs West and Calico Enterprises were the purchasers instead of Ritzau. Ritzau desired this arrangement for fear that if he acquired Albertson's interest without using the corporation as a conduit, he may incur what he knew then to be losses suffered by the corporation in the amount of $18,000.00, and may also be liable for the loans made by Provident Federal Savings to Calico, which Albertson had personally guaranteed. Albertson placed his stock in escrow as provided for in the "Agreement of Sale and Release" and when Ritzau inquired of Brown whether he should pay the first payment of $50,000.00 to the corporation, Brown responded that he should send it to Albertson. On December 11, 1970, Ritzau placed an interstate telephone call to his bank in California to have the bank transfer funds to Albertson's account in a Seattle, Washington bank, which was accomplished.
 
 
 45
 After the aforesaid exchange of money, Ritzau found that he had nothing on paper to indicate he had purchased Albertson's stock from the corporation. Accordingly, on February 5, 1971, when Ritzau was to pay $10,000.00 to Calico Enterprises as an installment on the balance due of $25,000.00 for the Albertson interest, Ritzau and Brown executed a promissory note in the amount of $50,000.00 as security for the transfer of Albertson's interest. The note was backdated to December 11, 1970. Additionally, an addendum was attached to the "Agreement of Sale and Release" which stated that if a general partnership interest the same as Albertson's was transferred to Ritzau, then the note would be void. The addendum was backdated to December 11, 1970. Ritzau not only desired to have his transaction reflected on paper and to have security in terms of the land held by Warm Springs West for the transfer of Albertson's interest, but he also wanted the partnership power of Brown to bind other partners curtailed. Another promissory note for $10,000.00 was executed by Brown on behalf of Calico Enterprises and WSW reflecting the payment by Ritzau of $10,000.00 on February 5, 1971.
 
 
 46
 On February 11, 1971, Brown, acting on behalf of the same entities, extended the date of maturity on the original $50,000.00 note until March 11, 1971. Ritzau paid another $10,000.00 toward the purchase of Albertson's interest on February 19, 1971, and received a third promissory note for the same amount executed by Brown on behalf of the two entities. Ritzau's last payment of $5,000.00 was made March 12, 1971, and, as before, he received a promissory note in the same amount as security, which was executed by Brown on behalf of the two entities.
 
 
 47
 The partnership agreement for Warm Springs West was never amended to reflect Ritzau's interest nor were any other documents of transfer drafted and Ritzau has not received stock certificates from Albertson or the corporation. Throughout the relevant period, Ritzau never assumed director-voting status in the corporation and Albertson continued on the Board of Directors until at least May 25, 1971. Albertson never received the last $25,000.00 paid by Ritzau to Calico Enterprises, and despite Brown's assurances to Albertson that it would be paid as soon as the corporation's temporary cash flow was corrected, the money was consumed by the debt-ridden corporation as it unfortunately rushed toward bankruptcy in the Spring of 1971.
 
 
 48
 On May 25, 1971, Ritzau revealed his notes to the Board of Directors, at which time John Albertson, Richard Lomas, Frederick Kimball and William White discovered their existence. Peter Flood was aware of their existence for the reason that he advised Ritzau to take the notes as security. The Board passed a resolution to the effect that Ritzau's status in relation to the corporation was that of a creditor rather than as a holder of an equity interest. Ritzau filed a claim in the bankruptcy court in the amount of $75,000.00. In the Matter of Calico Enterprises, Inc., Cause No. BK 71-431, District of Idaho, 1971. The court allowed only $25,000.00, which amount was received by the debtor corporation and benefitted the same, its creditors and stockholders. However, the court disallowed the remainder of Ritzau's claim for the reason that the money was paid to Albertson and did not benefit the corporation.
 
 
 49
 In June, 1970, the Board of Directors consisted of Flood, Albertson, Lomas and the Enterprises of Sun Valley group (ESV). As a result of negotiations with Brown, Frederick Kimball was able to accumulate various investors' money to be funneled into Enterprises of Sun Valley, which would be loaned to Calico Enterprises. Enterprises of Sun Valley, Inc. is a corporation and Enterprises of Sun Valley is a limited partnership, both of which exist under the laws of the State of Washington. William White, Dave McGrath and Kimball were principals in ESV and were elected to the Board of Directors of Calico Enterprises, Inc. in June, 1970. Kimball is a knowledgeable businessman, having degrees in economics, engineering and business, and has considerable experience in real estate development and managerial consulting. In the early part of 1970, Kimball contacted White to join in the process of forming ESV. White, much like Kimball, has considerable background in business and has engaged in real estate development and managerial consulting.
 
 
 50
 On March 20, 1970, ESV, as lessor, entered into a lease with Calico Enterprises, Inc., as lessee of 7 condominium units, construction of which was to be paid for by ESV. The lease arrangement was for a 20-year term with an option to renew potentially for another 50 years, and envisioned a 12% Return per annum to ESV. As partial consideration for the agreement, ESV was given the right to have 3 directors on the Board of Calico Enterprises, but in the event of default on three months' rent payments, ESV was given the power to assume 2/3 majority control of the Calico Board of Directors. Likewise, on March 20, 1970, ESV and Calico Enterprises entered into a chattel lease whereby ESV purchased $136,547.00 worth of chattels to equip and furnish the Calico Lodge which, in turn, were rented to Calico Enterprises, giving ESV a 22.1% Return on its investment.
 
 
 51
 As of December 10, 1970, Kimball had received a 10% Interest in Calico Enterprises, Inc. from Robert Brown with an additional 10% Interest to be held in trust. On March 20, 1970, Kimball sought to become a limited partner in Warm Springs West; however, a certificate of limited partnership was not recorded in Idaho.
 
 
 52
 White had the understanding as of November 20, 1970, that Ritzau was purchasing Albertson's interest and Kimball became aware of such fact after December 10, 1970, and at the February Board of Directors meeting prevented Ritzau from voting for the reason that the Albertson transaction had not been completed.
 
 
 53
 Ritzau, as well as all the defendants, thought in December, 1970, and as late as the Spring of 1971, that if the condominiums had sold, Calico would have been a very profitable venture, yet Calico Enterprises, Inc., Calico Construction & Development, Inc., and Warm Springs West had no significant assets at the time of this suit and the equity interest which Ritzau sought to purchase, as well as the equity interests of Lomas, Brown and Kimball, are worthless.
 
 
 54
 (Memorandum of Decision and Order, filed August 4, 1975, pp. 2-10.)
 
 
 
 *
 The Honorable J. Joseph Smith, Senior United States Circuit Judge for the Second Circuit, sitting by designation
 
 
 [1]
 Appellants Gayle P. Albertson, Cornelia Brown and Jeanne Lomas were partners in W.S.W., but apparently took no other role in the transactions which led to this action. Similarly, plaintiff Pamela Ritzau, the wife of plaintiff Philip B. Ritzau, took no active part in the transactions
 
 
 [2]
 Since we deny the motion to dismiss, we need not consider whether dismissal also would require vacation of the judgments below as to Flood and Lomas. See Benz v. Compania Naviera Hidalgo, S. A., 205 F.2d 944 (9th Cir.), Cert. denied, 346 U.S. 885, 74 S.Ct. 135, 98 L.Ed. 389 (1953), in which, in declaring an appeal moot we decreed that what had been determined below with reference to the mooted appeal was of no further force or effect
 
 
 [3]
 The extent of Brown's knowledge of the control provisions in the E.S.V. chattel lease, of the failure to indicate the payables, and of the failure to disclose Albertson's true motives in selling may not be seriously in issue, but in light of the finding of optimism as to the venture's success at the time of the December transaction, his intent to deceive may well be in issue. As to the other appellants, knowledge as to one or more of the three critical items may be questionable the court found Flood had no knowledge of Albertson's real reason for the sale. The fraudulent intent of each is in issue, negating the possibility of vicarious liability on the Securities Exchange Act claim. See Kamen & Co. v. Paul H. Aschkar & Co., 382 F.2d 689 (9th Cir. 1967), Cert. dismissed, 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85 (1968). The finding of liability under § 10(b) and Rule 10b-5 cannot, therefore, stand under the statute and rule as now limited
 
 
 [4]
 Section 11, adopted in Idaho as § 53-211 of the Idaho Code, provides:
 A person who had contributed to the capital of a business conducted by a person or partnership erroneously believing that he has become a limited partner in a limited partnership, is not, by reason of his exercise of the rights of a limited partner, a general partner with the person or in the partnership carrying on the business, or bound by the obligations of such person or partnership: provided, that on ascertaining the mistake he promptly renounces his interest in the profits of the business, or other compensation by way of income.
 An explanatory note by the principal draftsman of the Act, which accompanied the Act at the time of its recommendation to the states by the National Conference of Commissioners on Uniform State Laws states:
 (t)he limited partner, not being in any sense a principal in the business, failure to comply with the requirements of the act in respect to the certificate, while it may result in the nonformation of the association, does not make him a partner or liable as such. The exact nature of his liability in such cases is set forth in Sec. 11.
 National Conference on Uniform State Laws, Proceedings, Twenty-Sixth Annual Meeting 386-87 (1916). The principal draftsman commented elsewhere with respect to section 11:
 (S)uppose a person is asked to contribute to the capital of a business conducted by a person or partnership, and that he does so, believing he has become a limited partner, but the certificate required to be filed is not filed, or being filed is so defective that no limited partnership has been formed. Under existing acts a person in the position described runs a danger of becoming a general partner, if he takes a share in the profits, and a still greater danger if he exercises a limited partner's right to look over the books and give advice to his supposed co-partners. It is immaterial that he may have thought all things had been done necessary for the formation of the limited partnership, and also that the persons doing business with the partnership may at the time they extended credit believe he was a limited partner. Section 11 of the Uniform Act meets this situation by providing that a person who has contributed to the capital of a business conducted by a person or partnership, erroneously believing that he has become a limited partner in a limited partnership, is not, by reason of his exercise of the rights of a limited partner, a general partner with the person or in the partnership carrying on the business; provided that on ascertaining the mistake he promptly renounces his interest in the profits of the business or other compensation by way of income. (Lewis, The Uniform Limited Partnership Act, 65 U.Pa.L.Rev. 715, 723-24 (1917)).
 
 
 [5]
 See the Transcript of Kimball's testimony at p. 41. This parallels pretty closely the situation in Vidricksen
 
 
 [6]
 See also, E. g., d'Hedouville v. Pioneer Hotel Co., 552 F.2d 886 (9th Cir. 1977); C. R. Fedrick, Inc. v. Borg-Warner Corp., 552 F.2d 852 (9th Cir. 1977); Smith v. Sturm, Ruger & Co., 524 F.2d 776 (9th Cir. 1975); American Timber & Trading Co. v. First National Bank of Oregon, 511 F.2d 980 (9th Cir. 1974), Cert. denied, 421 U.S. 921, 95 S.Ct. 1588, 43 L.Ed.2d 789 (1975); Kovacs v. Sun Valley Co., 499 F.2d 1105 (9th Cir. 1974); Klingebiel v. Lockheed Aircraft Corp., 494 F.2d 345 (9th Cir. 1974); Douglas v. Beneficial Finance Co. of Anchorage, 469 F.2d 453 (9th Cir. 1972); Turnbull v. Bonkowski, 419 F.2d 104 (9th Cir. 1969)