608 F.2d 377
 Fed. Sec. L. Rep. P 97,171
SPECTRUM FINANCIAL COMPANIES, Plaintiff-Appellant,
Kenneth B. Bonilla et al., Intervenors-Appellants,
v.
MARCONSULT, INC., et al., Defendants-Appellees.
Allen L. BARBIERI et al., Plaintiffs-Appellants,
James E. Nevitt, Intervenor-Appellant,
v.
MARCONSULT, INC., et al., Defendants-Appellees.
SPECTRUM FINANCIAL COMPANIES, Plaintiff,
Kenneth B. Bonilla et al., Intervenors-Appellants,
v.
MARCONSULT, INC., et al., Defendants-Appellees.
 Nos. 76-2546, 76-2651.
 United States Court of Appeals,
Ninth Circuit.
 Nov. 14, 1979.
As Amended Jan. 3, 1980.
 
 Michael R. Mitchell, Los Angeles, Cal., for appellant Spectrum Financial Companies.
 John P. McNicholas and Ralph Jonas, Los Angeles, Cal. for appellant intervenors.
 Richard P. Booth, Jr., Los Angeles, Cal., for appellee Harris Kerr Forster & Co.
 Appeal from the United States District Court for the Central District of California.
 Before WRIGHT, Circuit Judge; HOFFMAN, Senior District Judge;* and FERGUSON, District Judge.**
 EUGENE A. WRIGHT, Circuit Judge:
 
 
 1
 Spectrum Financial Companies, the general partner of two limited partnerships, sued under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (1976), and § 17(a) of the Securities Exchange Act of 1933, 15 U.S.C. § 77q (1976), alleging that Marconsult, Inc. and its accounting firm, Harris, Kerr, Forster and Company (HKF), made false and misleading statements regarding the value of Marconsult stock which Spectrum's limited partners received in exchange for oil and gas leases. Several limited partners intervened.
 
 
 2
 The district court refused to certify as a class Spectrum and its limited partners and granted HKF's motion for summary judgment.
 
 
 3
 We affirm the denial of class certification and reverse the grant of summary judgment. The case is remanded for reconsideration in light of Nelson v. Serwold, 576 F.2d 1332 (9th Cir.), Cert. denied, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978).
 
 FACTS
 
 4
 In January, 1972, Spectrum entered into an agreement with Marconsult. The limited partners agreed to exchange their interests in oil and gas wells for common stock and debentures of Marconsult. The agreement was conditioned upon qualification of the securities with the California Commissioner of Corporations and upon approval of the exchange by 75% Of the limited partners.
 
 
 5
 In March, 1972, Marconsult applied to the Commissioner for a permit to issue its common stock and convertible notes to Spectrum. Two days later, Marconsult hired HKF to audit its financial condition and render an opinion for the 1971 calendar year.
 
 
 6
 On May 8, HKF delivered to Marconsult draft copies of a financial statement for the calendar year 1971, together with its audit report dated April 24, 1972. The 12-month statement was unfavorable, disclosing that Marconsult had but $57,000 in sales and had suffered a loss of almost $250,000 during the year.
 
 
 7
 The Commissioner's hearing took place on May 16. Marconsult did not distribute the financial statement to Spectrum and the limited partners or submit it for the consideration of the Department. Following the hearing, the Deputy Commissioner indicated that the application stood submitted pending the filing of additional financial data. HKF delivered to Marconsult its opening letter, with financial statements, on May 24.
 
 
 8
 The report was furnished to no one outside Marconsult. Instead, the company requested HKF to prepare and certify new financial statements covering a 16-month period from August 31, 1970 to the end of 1971.
 
 
 9
 Meanwhile, despite the fact that no additional financial data were submitted to the Department, the permit to issue securities was granted on June 22. It contained a legend severely restricting the transfer of the securities in the limited partners' hands.
 
 
 10
 HKF delivered the 16-month financial statement to Marconsult in early July. It incorporated more than $200,000 of business conducted during the four months before the beginning of the 1971 calendar year. As a result, it was considerably more favorable than the 12-month report. HKF's new opinion letter followed on July 18.
 
 
 11
 Spectrum received the requisite 75% Approval on July 10. None of the accepting limited partners had seen any of Marconsult's financial statements, and the 16-month report had not been disseminated outside Marconsult as of that date. On August 17, nevertheless, Marconsult applied to the Commissioner for an order removing the restriction on transfer, and the 16-month statement was submitted as part of the application. The Commissioner removed the restriction.
 
 
 12
 The exchange took place in October 1972. In July 1973, it was apparent that Marconsult had fallen drastically short of its income projections and was virtually insolvent.
 
 
 13
 Spectrum filed suit, alleging that Marconsult and HKF violated federal securities laws by failing to disclose the shaky foundation of Marconsult's stock. Spectrum's limited partners moved for an order certifying them as a class. The motion was denied as was a motion for interlocutory appeal. Fifty-six of the 92 nonparty limited partners then filed a new action, and the two actions were consolidated for trial.
 
 
 14
 HKF moved unsuccessfully for summary judgment in December 1975. In March 1976, the Supreme Court decided Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). HKF renewed its motion on the basis of the scienter requirement of that case and this time summary judgment was granted.
 
 SUMMARY JUDGMENT
 
 15
 Summary judgment is appropriate only where there is no genuine issue as to any material fact. Fed.R.Civ.Proc. 56; Lane Bryant v. Maternity Lane, 173 F.2d 559, 565 (9th Cir. 1949). All inferences that can be drawn from the depositions, admissions, and affidavits on file must be viewed in a light most favorable to the party opposing summary judgment. United States v. Diebold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).
 
 
 16
 A genuine issue must be predicated on a viable legal theory. McGuire v. Columbia Broadcasting System, Inc., 399 F.2d 902, 905 (9th Cir. 1968). In this circuit, prior to Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), scienter was not a necessary predicate for liability under § 10(b) and Rule 10b-5. See, e. g., White v. Abrams, 495 F.2d 724, 734-35 (9th Cir. 1974). We applied a "flexible duty" standard incorporating many factors to determine whether the defendants had a duty to disclose information relevant to the purchase or sale of securities. Id.
 
 
 17
 The district court denied summary judgment under the applicable Ninth Circuit standard, but granted it after Hochfelder clearly established that scienter is an element of Rule 10b-5 violations. Because this change in the applicable legal standard was the only event intervening between the denial and grant of summary judgment, we must assume that the trial court believed there were genuine issues of material fact under the old standard but that appellants failed to establish a genuine issue with respect to scienter.
 
 Scienter
 
 18
 Appellants argue that the trial court erred in interpreting too strictly the scienter requirement. They contend that the element of scienter may be established by proof of reckless behavior, and that the pleadings and depositions on file raise a genuine issue of material fact as to whether HKF acted recklessly in supplying Marconsult with the 16-month statement.
 
 
 19
 In Hochfelder, the Court reserved the question whether "reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b-5." 425 U.S. at 193-94 n.12, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668. This court answered the question affirmatively in Nelson v. Serwold, 576 F.2d 1332 (9th Cir.), Cert. denied, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978).
 
 
 20
 Nelson contains a thorough discussion of the scienter requirement and the effect of Hochfelder. We concluded that "recklessness, or some degree of intent not sufficiently aggravated to be characterized as 'deliberate and cold-blooded' " would support liability under § 10(b) and Rule 10b-5. Nelson v. Serwold, 576 F.2d at 1338. Our holding is in accord with those of other circuits. See, e. g., Edward J. Mawod & Co. v. Securities & Exch. Com'n, 591 F.2d 588, 596 (10th Cir. 1979); Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 46 (2d Cir. 1978); Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1045 (7th Cir.), Cert. denied, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977).
 
 
 21
 The district judge did not have the benefit of our decision in Nelson when he granted summary judgment. He did not indicate whether he examined the depositions in light of a recklessness standard or required some stricter showing of intent. We believe that he should have the opportunity to determine, in the first instance, whether appellants have raised a genuine issue of material fact with respect to whether HKF acted recklessly. We must reverse the grant of summary judgment and remand for reexamination in light of Nelson v. Serwold.
 
 Duty to Disclose
 
 22
 Beyond the issue of whether or not appellees were "reckless" is the question of whether they had any duty to disclose material information to appellants. In White v. Abrams, 495 F.2d 724, 735-6 (9th Cir. 1974), this court delimited the duty owed by a given defendant to a given plaintiff. Our recent decision in Zweig v. Hearst Corp., 594 F.2d 1261 (9th Cir. 1979), restated the White "flexible duty standard":
 
 
 23
 (these) factors are relevant in determining the scope of the duty to disclose material facts under Rule 10b-5: (1) the relationship of defendant to plaintiff; (2) defendant's access to the information as compared to that of plaintiff; (3) defendant's benefit derived from the relationship; (4) defendant's awareness of whether plaintiff was relying on their relationship in making his or her investment decisions; and (5) defendant's activity in initiating the transaction in question.
 
 
 24
 Id. at 1268.
 
 
 25
 A brief application of the present facts to this standard reveals that there was at least a triable issue of fact as to whether appellees owed appellants any duty.
 
 
 26
 1. Relationship of Plaintiff to Defendant.
 
 
 27
 While the relationship was indirect, it surely existed. HKF knew that a buyer had been found for what was essentially worthless stock. It also knew that without a buyer for its stock, Marconsult would not be in a position to pay HKF's fee. HKF's strong incentive to make Marconsult "look good" on paper created a relationship with any potential buyer not unlike the relationship in Zweig, where a financial columnist had a strong incentive to make a particular merger appear attractive to his readers. We there held that the columnist owed a duty to disclose to his readers his interest in the merger.
 
 
 28
 2. Defendant's Access to Information.
 
 
 29
 It goes without saying that an accountant has greater access to a company's financial data than a potential purchaser. Appellees note that the limited partners could have obtained any needed information by utilizing the subpoena power of the Commissioner of Corporations. Even if they had done so, however, they would not have obtained the data as easily as could HKF, nor would they be as skilled in interpreting the raw data.3. Benefit to Defendant.
 
 
 30
 As noted above, in light of Marconsult's bleak financial picture, it seems clear that HKF's fees might not have been paid had a buyer not been found.
 
 
 31
 4. Defendant's Awareness of Plaintiff's Reliance.
 
 
 32
 In initially approving the exchange, the Commissioner severely restricted the transferability of the stock. After he read the 16-month financial statement prepared by HKF, he removed the restriction. This gave rise to a triable issue of fact as to the impact of the financial statement both on the Commissioner and on appellants. As noted earlier, the entire transaction was conditioned on the Commissioner's approval, as HKF well knew. If appellants relied on HKF's statement, it is logical to conclude that appellants relied on HKF, and that HKF knew of this reliance.
 
 
 33
 5. Defendant's Initiation of the Transaction.
 
 
 34
 This factor is clearly not relevant here, as HKF was consulted only after the transaction was under way. Nevertheless, enough of the factors comprising the "flexible duty standard" are present to conclude that there is a triable issue of fact as to whether or not HKF owed a duty to appellants. Summary judgment was therefore inappropriate.
 
 CLASS CERTIFICATION
 
 35
 Appellants also protest the district court's denial of class certification.
 
 
 36
 Rule 23(a) of the Federal Rules of Civil Procedure sets forth these prerequisites to a class action:
 
 
 37
 (1) the class must be so numerous that joinder of all members is impracticable,
 
 
 38
 (2) there must be questions of law or fact common to the class,
 
 
 39
 (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class, and
 
 
 40
 (4) the representative parties must fairly and adequately protect the interests of the class.
 
 
 41
 The determination whether a class should be certified should not be overturned on review unless it is shown that the district court abused its discretion. Hornreich v. Plant Industries, Inc., 535 F.2d 550, 552 (9th Cir. 1976).
 
 
 42
 Appellants have asserted that joinder of the limited partners is impracticable. Following denial of class status, however, Spectrum was able to reach all 92 limited partners, 56 of whom joined in the second lawsuit that was later consolidated with the original action. This indicates that joinder was not impracticable. Moreover, it may indicate that several potential members of the class did not wish to pursue their claims, despite the fact that it would cost them nothing.
 
 
 43
 Appellants also contend that all questions of law or fact in the case are common to the limited partners. There is evidence in the pleadings that the several intervenors relied on different communications when they decided to approve the exchange. Some of the representations made to them were by Spectrum, and there may have been reason for the trial judge to believe that the interests of these parties would be in conflict if the case went to trial. Although it appears that most of the issues are common to all potential members of the class, the judge did not abuse his discretion in denying certification.[1]
 
 
 44
 We affirm in part, reverse in part and remand the case to the district court for proceedings in accordance herewith.
 
 
 45
 FERGUSON, District Judge, concurring specially.
 
 
 46
 While I concur in the decision of the majority, I do not join in that section of the opinion which addresses the issue of duty to disclose. This case provides the circuit with an opportunity to clarify its position on the effect that Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), and Nelson v. Serwold, 576 F.2d 1332 (9th Cir.), Cert. denied, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978), had on our 1974 decision in White v. Abrams, 495 F.2d 72 (9th Cir. 1974).
 
 
 47
 In the three years since the Supreme Court decided Hochfelder, overruling the "flexible duty" negligence standard of White v. Abrams in favor of a form of scienter involving more than negligence, this circuit has addressed the question of White v. Abrams ' continuing vitality several times with varying results.
 
 
 48
 Initially, this circuit seemed to take the position that the Supreme Court had dealt a death blow to White v. Abrams in footnote 12 of Hochfelder, where the Court listed the decision as an example of the negligence standard it was repudiating. In Robinson v. Heilman, this court held that the scienter standard encompassed some of the factors from the duty analysis, but that there should not be a separate duty inquiry. Robinson v. Heilman, 563 F.2d 1304 (9th Cir. 1977). The court stated: "Of course, the closer the relationship of the person charged to the corporation and the greater his participation in the transactions attacked, the easier it will be to prove the requisite Scienter. That state of affairs, however, provides no justification for any inference that direct participants have any greater or different duty to buyers or sellers of securities than those whose connections with the transactions may be more remote." Id. at 1308.
 
 
 49
 Then, the circuit resurrected White in Crocker Citizens National Bank v. Control Metals Corp., 566 F.2d 631 (9th Cir. 1977). The court held that "(a) bsent the possibility of liability based upon negligence, Hochfelder is not inconsistent, on its facts, with the flexible duty standard established in White v. Abrams." Id. at 636 n. 2. The circuit reiterated the Crocker view in Zweig v. Hearst, 594 F.2d 1261, 1268 n. 13 (9th Cir. 1979), and again in Kidwell ex rel. Penfold v. Meikle, 597 F.2d 1273, 1294 (9th Cir. 1979); yet it took a different approach in Ritzau v. Warm Springs West and treated the standard as "rejected":
 
 
 50
 The district court's reliance on the "flexible duty" standard of White v. Abrams was well placed at the time of decision, but the Supreme Court has since explicitly rejected that standard in Ernst & Ernst v. Hochfelder, supra, 425 U.S. at 193 n. 12, 96 S.Ct. 1375, a rejection binding on us.
 
 
 51
 Ritzau v. Warm Springs West, 589 F.2d 1370, 1374 (9th Cir. 1979). In addition, when the circuit decided that recklessness satisfies Hochfelder's scienter requirements, it made no mention of a separate duty analysis. Nelson v. Serwold, supra, 576 F.2d 1332.
 
 
 52
 Two district courts in the Ninth Circuit have faced the Hochfelder/White v. Abrams issue. In the first case, which predated the opinions listed above, the court held that the flexible duty test and the scienter requirements of Hochfelder were each prerequisites to 10b-5 liability. Carr v. New York Stock Exchange, 414 F.Supp. 1292, 1300 (N.D.Cal.1976). More recently, a district court observed that "(b)ecause (the) flexible duty standard permitted liability in certain circumstances based upon negligence alone, its precedential value is in question after Hochfelder." In re Gap Stores Securities Litigation, 457 F.Supp. 1135, 1140-41 (N.D.Cal.1978). After comparing Crocker-Citizens National Bank v. Control Metals Corp., supra, with Robinson v. Heilman, supra, the court concluded: "Until the Ninth Circuit explicitly re-examines White v. Abrams, however, it should be followed to the extent it is not directly inconsistent with Hochfelder." In re Gap Stores Securities Litigation, supra, at 1141.
 
 
 53
 I believe that a re-examination of the flexible duty standard in light of Hochfelder shows that the time has come to lay White v. Abrams to rest. The five-factor duty analysis helps a court evaluate the foreseeability of harm to a plaintiff from the defendant's actions and the level of culpability of the defendant's conduct. These evaluations are relevant, and even necessary, to a finding of liability based on negligence. After Hochfelder, supra, and Nelson v. Serwold, supra, however, 10b-5 liability requires proof of recklessness, and the duty analysis is no longer appropriate.
 
 
 54
 This court has not defined recklessness in the context of securities violations,[1] but the Second and Seventh Circuits have described "(r) eckless conduct (as), at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' "[2] Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978), Quoting Sanders v. John Nuveen & Co., 554 F.2d 790, 793 (7th Cir. 1977).
 
 
 55
 If this circuit adopts a similar definition of recklessness, the scienter requirements of Hochfelder and Nelson will be satisfied when a court concludes that a defendant's conduct was highly unreasonable and presented a known or highly obvious danger to the plaintiff. If the circuit should adopt a different definition, the scienter requirements will be satisfied when the test set forth in that definition is met. There is no reason to require the court then to engage in a complex, multi-facted duty analysis which was designed to test negligence.
 
 
 56
 It may be useful at this point to consider a bit of the history of White v. Abrams. Before Hochfelder established that negligence could not be the basis for 10b-5 liability, the circuit courts wrestled for years with different state of mind requirements. When this circuit decided White v. Abrams, Professor Bromberg hailed the five-factor flexible duty standard as "an important break from traditional verbalisms, . . . promis(ing) emphasis on more significant aspects of cases." A. Bromberg, 4 Securities Law, Fraud § 8.4(500) (Supp.1975).
 
 
 57
 The verbalisms from which White departed were those of common law fraud which had dominated 10b-5 law up to that time. The White court's departure was based, in part, on Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), where the Supreme Court had held that causation was established without proof of reliance, where the defendants had a duty to disclose but nonetheless withheld material facts. Id. at 154, 92 S.Ct. 1472. This court saw Ute as disregarding common law fraud elements for an analysis of "what kind of a duty rule 10b-5 imposes." White v. Abrams, supra, 495 F.2d at 731. The court stated:
 
 
 58
 Although the elements of common law fraud were important in defining what factors should be considered, they were neither limits nor barriers to the extent of the defendant's duty under the rule.
 
 
 59
 The expressions of the Court are not only meaningful, but chart the way for a proper analysis of 10b-5 liability. It is not based upon easily defined, well-known legal theories such as common law fraud, nor is it based upon convenient, differently interpreted, short hand latin phrases behind which one can sweep complex determinations. Rather, we are to examine the totality of the factual context and measure it by the duty imposed on the defendant.
 
 
 60
 Id. at 731-32.
 
 
 61
 Unfortunately, the duty standard in application sometimes does mask complex determinations. The five factors that the White court set out for consideration are:
 
 
 62
 (1) the relationship of the defendant to the plaintiff, (2) the defendant's access to the information as compared to the plaintiff's access, (3) the benefit that the defendant derives from the relationship, (4) the defendant's awareness of whether the plaintiff was relying upon their relationship in making his investment decisions and (5) the defendant's activity in initiating the securities transaction in question.
 
 
 63
 Id. at 735-36 (footnotes omitted).
 
 
 64
 Not all factors are necessary to a finding of liability in a given case. See, e. g., Kidwell ex rel. Penfold v. Meikle, supra, 597 F.2d at 1296-97; Zweig v. Hearst, supra, 594 F.2d at 1269. Instead, a court applying the test must "(w) eigh( ) all these facts in light of the principles of full disclosure that Rule 10b-5 was meant to foster." Kidwell ex rel. Penfold v. Meikle, supra, 597 F.2d at 1297.
 
 
 65
 A court examining elements such as the relationship of defendant to plaintiff and plaintiff's and defendant's relative access to information must weigh many of the same elements that figure into the traditional concepts of materiality and causation.[3] For example, whether a statement could reasonably be expected to influence the decision to sell and was therefore material will be affected by the two factors just listed as well as by defendant's awareness of plaintiff's reliance. Factors (3) and (5), which go to the defendant's culpability, may not be subsumed as clearly within the common law standards, but the two considerations may figure somewhat in the scienter analysis. To the extent that they are not thus incorporated, the factors only serve to confuse the liability determination. There is nothing in Hochfelder to suggest that a defendant who intentionally causes another to suffer damages through the purchase or sale of a security should be exonerated because he does not benefit financially from the relationship.
 
 
 66
 Application of the factors sometimes produces awkward results in other ways, as well. This case demonstrates the problem. Factor one looks to the relationship between defendant and plaintiff, properly contemplating a greater likelihood of liability where plaintiff and defendant are in a fiduciary relationship. See Rolf v. Blyth, Eastman Dillon & Co., Inc., supra, 570 F.2d at 44. There is no real relationship between plaintiff and defendant here, and there seldom would be one unless defendant were the buyer, seller or broker. Thus the court is confronted with the necessity of manufacturing the relationship from a tenuously defined benefit that the defendant receives from the transaction, as here, or dropping the requirement altogether, as it did in Zweig v. Hearst Corp., 594 F.2d 1261, 1267 (9th Cir. 1979).
 
 
 67
 We may avoid this problem quite easily by recognizing that the flexible duty negligence standard is just that a negligence standard. We have followed the Supreme Court's dictates in Hochfelder and required scienter instead of negligence. We should recognize that it is, therefore, no longer appropriate to apply a duty standard that was designed to compartmentalize and simplify a negligence inquiry. As does the case before us, Hochfelder addressed the liability of an accounting firm for omissions made in connection with the sale of a security. The Supreme Court inquired into scienter and made no separate duty inquiry, and we should do the same.
 
 
 
 *
 Of the Eastern District of Virginia
 
 
 **
 Of the Central District of California
 
 
 [1]
 HKF claims that because all 92 of Spectrum's limited partners received notice of the second lawsuit, and because 56 of them elected to join it, the class action question is moot now that the two cases have been consolidated. Thirty-six potential members of the class are not parties to the lawsuit. The issue is not moot unless all potential members of the class are parties
 
 
 [1]
 In Nelson v. Serwold, supra, 576 F.2d at 1338, we held only that "(t)he evidence supports a finding of recklessness, or some degree of intent not sufficiently aggravated to be characterized as 'deliberate and cold-blooded.' "
 
 
 [2]
 The Second Circuit left open the question whether it would find 10b-5 liability when recklessness was determined under the less strict test established in Stern v. American Bankshares Corp., 429 F.Supp. 818, 826 (E.D.Wis.1977): "plaintiff must allege . . . that the defendants knew or should have known of the facts and circumstances concerning the fraud." See Rolf v. Blyth, Eastman Dillon & Co., Inc., 570 F.2d at 47 n. 16
 
 
 [3]
 These concepts remain central to 10b-5 liability determinations. The Supreme Court framed the duty approach in Ute in terms of materiality and causation, Affiliated Ute Citizens v. United States, supra, 406 U.S. at 154, 92 S.Ct. 1456; and the lower courts continue to require these elements. See, e. g., Zweig v. Hearst Corp., 594 F.2d 1261, 1266 (9th Cir. 1979); Nelson v. Serwold, supra, 576 F.2d at 1335; St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 562 F.2d 1040, 1048 (8th Cir. 1977); Valente v. Pepsico, Inc., 454 F.Supp. 1228, 1236 (D.Del.1978)