566 F.2d 631
 Fed. Sec. L. Rep. P 96,291
CROCKER-CITIZENS NATIONAL BANK, a National Banking
Association, Plaintiff-Appellant,
v.
CONTROL METALS CORPORATION, Wayne Dougherty, William C.
Ogle, Pete Buffo, Nat Rosenberg, James E. Mack,
James H. Fors and George S. Smith,
Defendants-Appellees.
CROCKER-CITIZENS NATIONAL BANK, a National Banking
Association, Plaintiff, Counter-Defendant-Appellant,
v.
Wayne DOUGHERTY, Counter-Claimant Defendant-Appellee.
 Nos. 75-2140 and 75-2955.
 United States Court of Appeals,
Ninth Circuit.
 Dec. 7, 1977.
Rehearing Denied Jan. 24, 1978.
 
 Robert H. Edwards (argued) of MacDonald, Halsted & Laybourne, Los Angeles, Cal., for plaintiff-appellant.
 Lawrence P. Grassini, Hurley & Grassini (argued), North Hollywood, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before TUTTLE,* BARNES and WALLACE, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 Crocker-Citizens National Bank (the bank) brought suit against Control Metals Corporation (Control Metals), Dougherty, Ogle, Buffo, Rosenberg, Mack, Fors and Smith, seeking damages based on alleged violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 (10b-5) and common-law fraud. Dougherty filed a cross-claim against Control Metals, Ogle, Buffo, Mack, Rosenberg, Fors and Smith, and a counterclaim against the bank. The bank appeals from a judgment, entered subsequent to a jury's verdict, disallowing the bank's 10b-5 and fraud claims against Buffo, Mack, Ogle, and Dougherty. In addition, the bank appeals from a $20,000 judgment entered against it based upon Dougherty's counterclaim. We affirm in part and reverse in part.
 
 
 2
 * On February 26, 1969, Control Metals issued to Fors, its vice president, 160,000 shares of its unregistered common stock. Although the certificates bore no restrictive legends, the stock was nontransferable. Sometime between the date the shares were issued and March 5, 1969, Rosenberg learned that Fors wished to sell the recently acquired securities. Rosenberg passed this information to Buffo. Buffo in turn told Ogle. Ogle expressed interest in the securities and told Buffo that Dougherty might be willing to finance the purchase.
 
 
 3
 Some days later, Buffo and Ogle met with Dougherty and discussed generally the possibility of purchasing the stock. A few days later, Rosenberg met with Ogle, Buffo and Dougherty and explained to them that Fors would be willing to sell 50,000 shares for $20,000 and that the stock was actually worth approximately $1.50 per share. Rosenberg subsequently gave one or two of the certificates to Buffo for his inspection. Dougherty took the loaned certificates to his broker to ascertain their salability. The broker informed Dougherty that the stock could be sold if Dougherty obtained a "third party release."
 
 
 4
 In March 1969, Dougherty spoke with Kasselman, assistant vice president of the bank and manager of one of its branches, concerning whether the bank was interested in selling the stock. Kasselman apparently requested proof that Dougherty was entitled to sell the stock.
 
 
 5
 On March 5, 1969, Buffo and Ogle went to the office of their attorney, Mack, and requested his opinion regarding the stock's salability. On March 6, Mack issued a written opinion which stated that the stock was readily transferable and thus could be sold with impunity. Mack's opinion was, of course, wholly inaccurate and was based, among other things, upon the erroneous "fact" that "the shares themselves are not carried on the books of the corporation nor on the record of the transfer agent with any restriction whatsoever . . . ."
 
 
 6
 On March 6, Ogle, Buffo and Dougherty delivered the $20,000 to Fors. Four days later, Dougherty delivered Mack's opinion letter to Kasselman and signed an order to sell 10,000 shares of the Control Metals stock for his (Dougherty's) account.
 
 
 7
 During or shortly after this meeting, Kasselman called the bank's investment department to determine if it had any record of the stock having been stolen. Kasselman was informed that the bank had no report of stolen Control Metals securities. Kasselman examined the stock and observed that Fors' endorsement was guaranteed by a Nevada bank. Kasselman telephoned the Nevada bank and verified the endorsement. Kasselman also read the Mack opinion letter of March 6.
 
 
 8
 On March 19, 1969, Control Metals issued 15,000 shares of its common stock to Smith, another of its vice presidents. These shares were also unregistered and were nontransferable. Some or all of these shares were eventually passed through Rosenberg and Ogle and were sold by the bank for Dougherty's account.
 
 
 9
 On March 27, Dougherty delivered to the bank two additional opinion letters signed by Mack. These letters made substantially the same representations as the original letter of March 6. One of these letters pertained to the 15,000 shares of Control Metals which Ogle had acquired from Smith. The other letter referred to 50,000 shares of Consolidated Industries which Ogle had acquired from Rosenberg. About April 9, 1969, Mack issued another opinion letter covering additional shares of Control Metals. This final letter was also delivered to Kasselman.
 
 
 10
 During the period between March 10 and May 1, 1969, the bank sold 145,000 shares of Control Metals and 50,000 shares of Consolidated Industries for Dougherty's account. Proceeds from these sales were divided among Rosenberg, Ogle, Buffo, Sinclair (not a party) and Dougherty. Mack received only his attorney's fees.
 
 
 11
 In the latter half of April 1969, the bank was informed by the transfer agents for Control Metals and Consolidated Industries that the shares were nontransferable. In May the bank brought a like number of shares in order to deliver valid shares to the purchasers of the stock. On May 14, 1969, the bank confiscated the cash balance in Dougherty's account which totaled $15,161.41. The total cost of covering the sales of Control Metals and Consolidated Industries stock was $230,587.50.
 
 
 12
 The bank brought 10b-5 and common law fraud claims against Control Metals, Dougherty, Ogle, Buffo, Mack, Fors, Rosenberg, and Smith. Dougherty counterclaimed against the bank, seeking judgment in the amount of $15,161.41 plus interest on the basis of conversion and negligent misrepresentation. Dougherty also cross-claimed against Control Metals, Ogle, Buffo, Mack, Rosenberg, Fors, and Smith, seeking indemnification against any judgment secured by the bank. Rosenberg defaulted; jurisdiction was not obtained over Fors and Smith.
 
 
 13
 The jury returned a verdict in favor of the bank against Control Metals but found no liability as to Dougherty, Buffo, Ogle and Mack. The verdict also awarded Dougherty $20,000 on his counterclaim against the bank. After denying the bank's motions for judgment N.O.V., the district judge entered judgment in favor of the bank against Control Metals only and against the bank in favor of Dougherty in the amount of $20,000.
 
 
 14
 The bank now contends that the jury's verdict disallowing its 10b-5 and fraud claims against Ogle, Buffo, Mack and Dougherty was not supported by the evidence and that the district court erred in not granting the bank's motion for judgment N.O.V. against these individuals. The bank further contends that the jury's verdict in favor of Dougherty's counterclaim was not supported by the evidence and that the district judge erred in not granting its motion for judgment N.O.V. We now discuss these contentions.
 
 II
 
 15
 The bank requests that we reverse the judgment of the district court and enter judgment in its favor notwithstanding the verdict. While we have power to do so, Neely v. Martin K. Eby Construction Co., 386 U.S. 317, 322, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967), a judgment N.O.V. should not be granted unless "the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict . . . ." Cockrum v. Whitney, 479 F.2d 84, 85 (9th Cir. 1973), quoting Brady v. Southern Ry., 320 U.S. 476, 479, 64 S.Ct. 232, 88 L.Ed. 239 (1943). As we stated in Cockrum :
 
 
 16
 Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.
 
 
 17
 Cockrum v. Whitney, supra, 479 F.2d at 86, quoting Tennant v. Peoria & P.U. Ry., 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944). We might well have reached the opposite result had we tried the 10b-5 claim, but that is not the issue before us. We find that the jury's verdict reflects a reasonable construction of the evidence.[1]
 
 
 18
 Section 10(b) of the 1934 Act makes it unlawful for one "(t)o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j (1970).
 
 
 19
 Acting pursuant to this grant of rulemaking authority, the SEC promulgated Rule 10b-5, which provides:
 
 
 20
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 
 
 21
 (a) To employ any device, scheme, or artifice to defraud,
 
 
 22
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 
 
 23
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 
 
 24
 in connection with the purchase or sale of any security.
 
 
 25
 17 CFR § 240.10b-5 (1975).
 
 
 26
 After referring to this statute and rule, the district judge instructed the jury in light of White v. Abrams, 495 F.2d 724 (9th Cir. 1974).[2] Based upon the law, the jury could reasonably decide against the bank. For example, there was substantial evidence that at some point Fors offered Control Metals certificates bearing a legend indicating that the certificates were nontransferable. Buffo instructed Dougherty not to accept the "stamped stock." The jury could reasonably have believed that the refusal to accept nontransferable legended stock indicated their belief that nonlegended certificates would be transferable. This reasonable inference supports the conclusion that they acted without any degree of scienter in allowing the bank to execute sales of the securities.[3]
 
 
 27
 As regards the common law fraud claim, a prima facie case under California law requires proof of the following elements: (1) that the defendant make a false representation, (2) that defendant had knowledge of the falsity, (3) that defendant intended to induce reliance, (4) that plaintiff actually and reasonably relied, and (5) that plaintiff suffered actual damages. Vasquez v. Superior Court, 4 Cal.3d 800, 811, 94 Cal.Rptr. 796, 484 P.2d 964 (1971); Winn v. McCulloch Corp., 60 Cal.App.3d 663, 670, 131 Cal.Rptr. 597 (Ct.App.1976).
 
 
 28
 Once more, the jury could reasonably have concluded that the parties charged did not possess the necessary scienter to impose fraud liability. In addition, based on the evidence of the bank manager's independent investigation of the stock's marketability, the jury could have found that the bank did not rely on any alleged misconduct.
 
 III
 
 29
 Finally, the bank asks that we reverse the $20,000 judgment in favor of Dougherty and enter judgment in its favor notwithstanding the verdict. Dougherty asserts two possible bases for sustaining the judgment: (1) that the bank tortiously converted these funds from his account, or (2) that Dougherty suffered damages to this extent as a result of the bank's negligent misrepresentation regarding the stock's salability.
 
 
 30
 Dougherty's attempt to premise his counterclaim and the ensuing judgment on the tort of conversion[4] is wholly without merit. It is a well-settled principle of California law that the relationship between a bank and its depositor is one of debtor and creditor. Bank of Marin v. England,385 U.S. 99, 101, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966); Gonsalves v. Bank of America, 16 Cal.2d 169, 173, 105 P.2d 118, 121 (1940); Metropolitan Life Ins. Co. v. San Francisco Bank, 58 Cal.App.2d 528, 534, 136 P.2d 853 (Ct.App.1943). Therefore, when funds are deposited, title to those funds passes immediately to the bank. Id.; Allen v. Rainey, 4 Cal.App.2d 558, 563, 41 P.2d 374 (Ct.App.1935). Since the money thus becomes the literal property of the bank, it cannot be tortiously converted by the bank. Smith's Cash Store v. First Nat'l Bank, 149 Cal. 32, 35, 84 P. 663 (1906); Metropolitan Life Ins. Co. v. San Francisco Bank, supra, 58 Cal.App.2d at 534, 136 P.2d 853. See 9 Cal.Jur.3d Banks § 101 (1974). It necessarily follows that Dougherty's counterclaim cannot prevail on this theory.
 
 
 31
 The claim of negligent misrepresentation is essentially based on a conversation between Kasselman and Dougherty during which Kasselman reportedly stated that the bank could execute sales of securities on Dougherty's behalf "if it (was) good stock." The fact that the bank ultimately agreed to conduct the sales, argues Dougherty, constituted a representation that it had verified the salability of the stock.
 
 
 32
 We simply cannot agree that Dougherty could perceive or reasonably rely on Kasselman's conduct as a representation that the stock was readily marketable. Accordingly, we hold that Dougherty's counterclaim cannot be sustained on this basis either.
 
 
 33
 The bank confiscated the balance of Dougherty's account as a setoff against its losses resulting from the sales of Control Metals stock. California law recognizes an equitable right of banks to apply deposited funds as a setoff against a debt owed by the depositor to the bank. Kruger v. Wells Fargo Bank, 11 Cal.3d 352, 113 Cal.Rptr. 449, 521 P.2d 441 (1974); Gonsalves v. Bank of America, 16 Cal.2d 169, 105 P.2d 118 (1940); California Supreme Court Bank Setoff Against Depositor's Checking Account, 63 Cal.L.Rev. 135, 139 (1975). Moreover, this right of setoff applies equally in the case of a checking or savings account. Bank Setoff Against Depositor's Checking Account, supra, at 140 n.27. Compare Kruger v. Wells Fargo Bank,supra, with In re Bank of San Pedro, 11 Cal.2d 313, 315-16, 79 P.2d 1057, 1058 (1938). However, a bank may only exercise this equitable right of setoff in response to and to the extent of a matured debt owed by the depositor to the bank. See 9 Cal.Jur.3d, Banking, §§ 125, 127.
 
 
 34
 In the case before us, Dougherty owed no debt to the bank against which it could set off the balance of his account. Our affirmance of the district court's judgment absolving Dougherty of liability conclusively negates the claim that there was any "debt" upon which the bank could base a setoff. Accordingly, Dougherty is entitled to judgment in the amount of $15,161.41 plus interest from the date of confiscation to the date of judgment. We cannot ascertain whether this would total exactly $20,000.
 
 
 35
 The judgment of the district court in favor of Dougherty for $20,000 is reversed. We remand with directions that judgment be entered in favor of Dougherty as set forth above. The judgment of the district court is, in all other respects, affirmed.
 
 
 
 *
 Honorable Elbert P. Tuttle, United States Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 In our view, there is a substantial preliminary question as to whether the bank had standing to press its 10b-5 claim. Essentially, the question is whether one who sells for the account of another, i. e. a broker, falls within the purchaser-seller limitation of the Birnbaum rule. See Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), and Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). There appears to be scant authority on this issue. See Odette v. Shearson, Hammill & Co., 394 F.Supp. 946, 959 (S.D.N.Y.1975). In light of our disposition and the fact that this issue was not briefed, we do not reach the question
 
 
 [2]
 The district judge instructed the jury:
 The laws which I have just read to you establish the standards by which a person must conduct himself in connection with the purchase and sale of securities. In other words, Section 10b of the Securities and Exchange Act of 1934 and Rule 10b-5 impose a duty upon such persons not to employ any device, artifice or scheme to defraud, or to make any untrue statements of material fact or to omit to state a material fact which is necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.
 This duty standard imposed upon defendants in transactions of the kind here found is a flexible one. In determining whether a particular defendant has met his duty or has breached his duty as heretofore stated to you, imposed upon him by the law, you may consider such factors as:
 
 
 [1]
 The relationship of the defendant to the plaintiff
 
 
 [2]
 What access defendant had to information as compared to plaintiff's access to the same information
 
 
 [3]
 The benefit that the parties derive from the transaction or the relationship
 
 
 [4]
 The defendant's awareness of whether the plaintiff was relying upon their relationship in making his investment decision, and
 
 
 [5]
 Defendant's activity in initiating the transaction in question
 By way of example only, and at the extremes, where a defendant derives great benefit from a relationship of extreme trust and confidence with the plaintiff, the defendant knowing that said plaintiff completely relies upon him for information to which he has ready access, but to which plaintiff has no access, the law imposes a duty upon the defendant to use extreme care insuring that all material information is accurate and disclosed.
 On the other hand, where defendant's relationship with the plaintiff is so casual that a reasonably prudent person would not rely upon it in making decisions with respect to the transactions, the defendant's only duty is not to misrepresent intentionally material facts.
 The furthest reach of White v. Abrams has been curtailed by the Supreme Court in Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Simple negligence alone is insufficient for 10b-5 liability, but the Court specifically left open whether such liability might be based upon reckless behavior. Id. at 193 and 194 n.12. Absent the possibility of liability based upon negligence, Hochfelder is not inconsistent, on its facts, with the flexible duty standard established in White v. Abrams.
 As there was no contention in the case before us that liability involved negligence, and because only the defendants who prevailed could complain about any error in the jury instruction, there is no reason for us to consider further the impact of Hochfelder on the White standard.
 
 
 [3]
 Not only could the jury reasonably have concluded that there was not the requisite scienter to support 10b-5 liability, but it could also have concluded that the bank simply did not rely on the challenged conduct. While reliance may, of course, be inferred from materiality, Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), affirmative evidence of non-reliance may defeat this inference. Blackie v. Barrack, 524 F.2d 891, 906 n.22 (9th Cir. 1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); see Note, The Reliance Requirement in Private Actions Under SEC Rule 10b-5, 88 Harv.L.Rev. 584, 600 (1975). There was sufficient evidence that the bank did not rely on the alleged representations, but instead, made its own investigation, albeit inadequate, into the marketability of the stock
 
 
 [4]
 The bank has only sought to attack the judgment on the ground that it is not supported by the evidence. However, we deem the conversion theory to raise such glaring and crucial questions of law that we are compelled to raise them ourselves