Richard L. ZWEIG and Muriel Bruno, Appellants,

v.

The HEARST CORPORATION, a corporation, Alex N. Campbell, H. W. Jamieson, E. L. Oesterle, Appellees.

No. 76–1647.

United States Court of Appeals, Ninth Circuit.

April 9, 1979.

Philip M. Brown, David Pick, Alton I. Leib, Beverly Hills, Cal., for appellants.

Wixon Stevens, Los Angeles, Cal., for appellees.

Before ELY and GOODWIN, Circuit Judges, and SOLOMON *, District Judge.

GOODWIN, Circuit Judge:

Plaintiffs appeal from a judgment denying recovery in their action for damages against a financial columnist who, they allege, purposely used his column to elevate the price of stock in a small company for his own benefit.

Richard Zweig and Muriel Bruno sued Alex Campbell, a financial columnist for the Los Angeles Herald-Examiner; the Hearst Corporation, Campbell's employer; and H. W. Jamieson and E. L. Oesterle, directors of American Systems, Inc. (ASI). Zweig and Bruno alleged violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and of Rule 10b–5, 17 C.F.R. 240.10b–5, as well as common-law fraud and negligence.

Campbell wrote and the Herald-Examiner published a column that contained a highly favorable description of ASI. The plaintiffs alleged that the directors of ASI had made material misrepresentations and

* The Honorable Gus J. Solomon, United States District Judge for the District of Oregon, sitting by designation.

omissions in an interview with Campbell and hoped that he would publish false information "puffing" ASI shares. This is essentially what he did, but only after first buying 5,000 shares from the company at a substantial discount below their market price.

Zweig and Bruno claimed that Campbell's column about ASI caused the price of ASI stock to rise, and that they were damaged when they merged their company with ASI in exchange for a quantity of temporarily inflated ASI stock. The plaintiffs were under a contractual duty to exchange stock at the market price as of a time certain. They alleged that Campbell had violated Rule 10b–5 by publishing his column about ASI without disclosing to his readers that he had bought ASI stock at a discount and intended to sell some of it upon the rise in market price that he knew his column would cause.[1] In addition, plaintiffs contended, Campbell should have revealed to his readers that the column was likely to be republished as an advertisement for ASI in an investment periodical in which Campbell held a substantial ownership interest.

The case against the Hearst Corporation was dismissed by a summary judgment, on the ground that Hearst was not vicariously liable for Campbell's actions. Another panel of this court affirmed. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975).

The case against Campbell, Jamieson, and Oesterle went to trial without a jury in April of 1975. During the plaintiffs' opening statement and again after the testimony of the plaintiffs' first witness, the trial judge indicated that he did not agree with the plaintiffs' theory of liability under Rule 10b–5 as it applied to Campbell. Realizing that a full trial on the merits might be useless, the plaintiffs made an offer of

proof and asked the court to rule on Campbell's motion to dismiss in light of this offer of proof.

After considering the plaintiffs' offer of proof, the trial judge granted the motion to dismiss. The judge then issued "Findings of Fact and Conclusions of Law", and entered judgment for Campbell. *Zweig v. Hearst Corp.*, 407 F.Supp. 763 (C.D.Cal. 1976). The action against Jamieson and Oesterle has been settled; the only parties to this appeal are Zweig and Bruno (appellants) and Campbell (appellee).

We reverse.

## I. The Standard of Appellate Review

■ In their discussions with the trial court, the parties referred to Campbell's motion as a motion to dismiss pursuant to Fed.R.Civ.P. 41(b). Rule 41(b) provides:

> " * * * *After the plaintiff*, in an action tried by the court without a jury, *has completed the presentation of his evidence*, the defendant * * * may move for a dismissal on the ground that *upon the facts and the law* the plaintiff has shown no right to relief. *The court as trier of the facts* may then determine them and render judgment against the plaintiff * * *. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a) [findings of fact and conclusions of law]. * * * " (Emphasis added.)

The transcript reveals that the parties intended the motion to dismiss to test the legal sufficiency of the plaintiffs' claim. The record shows that, notwithstanding the provisions of Rule 41(b), the parties did not expect the trial judge to "try" the facts, but to assume the facts described in the offer of proof.[2] In effect, the motion functioned as

---

1. Originally the plaintiffs also claimed that Campbell was negligent in repeating the directors' misrepresentations in his column without investigating the accuracy of those statements. The plaintiffs do not raise on appeal the issue of whether this alleged negligence constituted a violation of Rule 10b–5.

2. The offer of proof contained self-serving testimony by Campbell, as well as evidence which tended to disprove that testimony.

The preface to the "Findings of Fact and Conclusions of Law" stated that the trial judge had considered the evidence "in a light most

a motion for summary judgment pursuant to Fed.R.Civ.P. 56.

When a trial court grants a motion to dismiss after the plaintiff presents his evidence, an appellate court will not set aside the trial court's findings of fact unless they are clearly erroneous. *Rutledge v. Electric Hose and Rubber Co.*, 511 F.2d 668, 676 (9th Cir. 1975). However, in reviewing a ruling on a motion for summary judgment the appellate court must decide whether, viewing the facts in the light most favorable to the parties opposing the motion, the moving party is entitled to prevail as a matter of law.[3] *Handi Investment Co. v. Mobil Oil Corp.*, 550 F.2d 543, 546 (9th Cir. 1977). We follow the summary judgment standard of review here.

## II. *Materiality of Omitted Facts*

■ Campbell wrote four or five columns a week during 1969 as a financial columnist for the Herald-Examiner. In these columns he frequently discussed the financial conditions of small companies in southern California. He often bought the shares of companies that he expected to discuss favorably in forthcoming columns, and then sold the shares at a profit soon after his columns appeared.[4]

In late May or early June of 1969, Campbell interviewed Jamieson, Oesterle, and another ASI officer to obtain information for a column about ASI. The ASI officials did not give Campbell complete or accurate information. They were silent about problems then confronting ASI. There is no claim that Campbell was a knowing party to any fraud by ASI, but Campbell engaged in no independent research before publishing his story. Campbell also purchased directly from ASI 5,000 shares of its stock. While the bid price of the ASI stock on the day of the purchase was 3⅝, Campbell paid only $2.00 per share.[5]

Two days after he bought the ASI shares, Campbell's column about ASI appeared in the Herald-Examiner. The article contained several erroneous statements that cast the company in a more favorable light

favorable to the plaintiffs." 407 F.Supp. at 764. This preface, like the rest of the facts and conclusions, was drafted by Campbell's attorneys and adopted by the trial court, a disapproved practice that severely hampers our review. *See Photo Electronics Corp. v. England*, 581 F.2d 772, 776–77 (9th Cir. 1978). As a result, even if we did not treat the findings and conclusions as a ruling on a motion for summary judgment, we would nonetheless scrutinize them more carefully than we would had the court itself originally drafted them. *Photo Electronics Corp. v. England, supra, citing Ceco Corp. v. Bliss & Laughlin Industries, Inc.*, 557 F.2d 687, 689 (9th Cir. 1977), *and Burgess & Associates, Inc. v. Klingensmith*, 487 F.2d 321, 324–25 (9th Cir. 1973).

3. The findings of fact made by the court, to the extent that they constitute findings contrary to inferences that could have been drawn in favor of the plaintiffs, were inappropriate. *Neely v. St. Paul Fire and Marine Insurance Co.*, 584 F.2d 341 (9th Cir. 1978). For example, the trial judge "found" that Campbell "had no plan to cause the [ASI] stock to rise and then immediately sell the same." Findings of Fact No. 20, 407 F.Supp. at 765. Because there was ample evidence to the contrary in the plaintiffs' offer of proof, this finding was improper.

4. During the two-year period prior to June 4, 1969, Campbell bought the stock of 21 companies shortly before his columns about those companies were to be published. In almost every case he sold at least some of his recently purchased stock within five days after the publication of the column about the company involved. In 21 of 22 sales occurring within five days of the publication of a column, Campbell made a profit because of an increase in the price of the stock after the publication of his column.

5. The plaintiffs have not presented the question whether Campbell's acceptance of the stock at a bargain price was the receipt of "consideration" for his column, within the meaning of Section 17(b) of the Securities Act of 1933, which provides:

"It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof." 15 U.S.C. § 77q(b).

than it deserved. On this record we assume that Campbell did not know that the misleading parts of his column were false. An inference is permissible that, while he made no effort to portray the facts accurately, he honestly believed the optimistic opinions of his codefendants, who were then (perhaps unknown to Campbell) preparing to close the executory plan of merger with plaintiffs' firm, Reading Guidance Center, Inc. (RGC).

Equally reasonable is the inference that Campbell knew that his column would run up the prices of ASI stock for a short time, during which persons who knew the reason for the increase could unload the stock at a profit. Thus, the trial judge's finding that Campbell had no plan to create the price rise and then sell was premature under the summary-judgment standard of review. Moreover, unless Campbell can produce more evidence than that already in the record to rebut the strong inference caused by his long history of similar dealings, any "finding" that he did not intend to profit from his stock purchase and concurrent column would be of dubious value under the clearly erroneous standard. We therefore presume an intent to profit, the inference urged by plaintiffs, at this stage of the case.

After Campbell's column appeared, the price of ASI stock rose swiftly. The plaintiffs' offer of proof included the opinion of an expert witness that the Campbell column caused a market increase in the number of investors wanting to buy ASI stock, and that this, combined with the "thin float" of the stock (500,000 shares outstanding), led to the dramatic increase in the bid price of the shares.[6]

On June 5, the day after the article appeared, Campbell sold 2,000 of his 5,000 ASI shares for $5.00 per share, thereby recouping his entire cash investment while retaining 3,000 shares of the stock for future profits.

Plaintiffs Zweig and Bruno did not know of any plan to inflate the price of the stock. Each owned one third of the shares of RGC. In February of 1969, RGC entered into a plan of reorganization by which RGC was to merge into ASI. ASI was to pay the RGC stockholders by transferring enough ASI stock to equal a market value of $1,800,000. The number of shares would be determined by the average closing bid for ASI stock for the five market days preceding the closing date, June 10, 1969.

The plaintiffs were prepared to show that an artificial price rise was caused by the Campbell column and led to a substantial dilution in the interest in ASI that they ultimately received under the merger agreement.

Zweig and Bruno argue that Campbell should be liable under Rule 10b–5 for his omission of these material facts from his column about ASI: (1) that he had invested in ASI stock at a discount price two days before his column was to be published, and intended to sell it on the short-swing rise in price; (2) that he made a practice of "scalping" the stocks of companies about which he wrote by buying their stock shortly before his columns about them were published and then selling the stock at a profit after the columns caused a jump in the market price; and (3) that his favorable columns were often reprinted as advertisements for the subject companies in a financial journal in which Campbell had an interest.[7]

Zweig and Bruno contend that Rule 10b–5 required Campbell to inform his readers of these facts so that the readers

---

6. According to this expert witness, the price of ASI stock would not have risen above $3.25 before June 10, 1969, without the Campbell column. But instead, the average closing bid price between June 3 and June 9 was $4.35 per share.

7. In 1969, Campbell had a financial interest in the California Financial Journal, a weekly publication specializing in news about business ventures in Los Angeles County. In was a regular practice of Journal employees to call companies Campbell had written about and solicit those companies to run copies of the Campbell columns as advertisements in the Journal. On July 1, 1969, the Campbell column on ASI ran as an advertisement in the California Financial Journal.

could judge for themselves whether Campbell's personal motives for promoting ASI affected his objectivity.

Rule 10b–5 provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5 (1978).

The appropriate test for the materiality of an omitted fact is whether there is a substantial likelihood that a reasonable investor would consider the fact important in making his or her investment decision. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)[8]; *Lewelling v. First California Co.*, 564 F.2d 1277 (9th Cir. 1977). The facts revealing Campbell's lack of objectivity were material under this test. Reasonable investors who read the column would have considered the motivations of a financial columnist such as Campbell important in deciding whether to invest in the companies touted. See *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1172 (2d Cir. 1970).

Had Campbell's story objectively reported an undisputed fact or news event, such as the discovery of a valuable mineral deposit or the declaration of a dividend, his

ownership of ASI stock might not have been significant in reasonable investors' minds. But given the column's style and tone, with its glowing praise of ASI and conclusion that the firm was a worthy investment despite its risks, the effect of Campbell's stock ownership on his objectivity would be important to his readers. We conclude, therefore, that the omitted facts alleged as violations were material. Unless some doctrine limits Campbell's duty to disclose the facts, he must be held liable for intentionally withholding them. Rule 10b–5 makes no distinction between material misrepresentations and nondisclosure of material facts necessary to keep other statements from being misleading.

### III. *The Duty to Disclose*

Most disclosure cases cited by the parties have involved a corporate insider, or a receiver of a tip, who traded in the corporation's stock without disclosing material facts that, if publicly known, would have affected the stock's market value. *See, e. g., Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228 (2d Cir. 1974); *S. E. C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). In most of these cases, the information withheld was directly relevant to inherent value of the firm's assets and operations, or its potential earnings and growth prospects.

██ In this case, the information withheld from the public was of a slightly different type. Viewing the evidence in the light most favorable to the plaintiffs, Campbell failed to reveal to investor-readers that he expected to gain personally if they followed his advice. He did not tell them that he had purchased the stock at a bargain price knowing that he would write his column and then sell on the rise, as he had done with other stocks before. He did not reveal that his column would also ap-

---

**8.** Although the *TSC Industries* case involved the materiality of information in proxy statements under Rule 14a–9, the Court's discussion suggests that the test for materiality would also apply in Rule 10b–5 cases. *See* 426 U.S. at 447 n.9, 96 S.Ct. at 2126.

pear as a paid advertisement for ASI in his journal. This withheld information did not relate directly to the company's value and expected performance, but it was necessary to avoid misleading Campbell's audience on the reliance they could place on the column. We hold that in failing to disclose these facts, Campbell violated Section 10(b) and Rule 10b–5 just as corporate insiders do when they withhold material facts about a corporation's prospects while trading its stock.[9]

Zweig and Bruno rely on *S. E. C. v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). In *Capital Gains*, the Supreme Court held that the SEC could obtain an injunction under the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b–1 *et seq.*, to force a registered advisory service to disclose its practice of profiting from the market effect of its investment recommendations, which it made in a monthly report to subscribers. The Court found the service's failure to disclose this practice a "fraud or deceit" on its clients within the meaning of the Investment Advisers Act of 1940.

The holding in *Capital Gains* was limited to the duties imposed on investment advisers by the 1940 Act. The plaintiffs here do not argue that Campbell was an investment adviser as defined in that statute; thus, *Capital Gains* is not controlling.[10] But the failure to bring the case within the Investment Advisers Act does not mean that the claim under Section 10(b) and Rule 10b–5 should fail. We hold that as applied to the facts we must assume in this case, the Investment Advisers Act was not meant to limit the Securities Exchange Act or Rule 10b–5. Instead, we believe that these provisions complement each other and pro-

---

**9.** *See United States v. Chiarella*, 588 F.2d 1358 (2d Cir. 1978) (criminal liability under Rule 10b–5 imposed on "markup man" in composing room of financial printing company who used knowledge of impending tender offers); *Lewelling v. First California Co., supra* (duty by brokerage firm to reveal to client that securities he was purchasing were being sold by firm's principal owner after passage through affiliated brokerage houses).

Commentators have devoted much discussion recently to the question of whether Rule 10b–5 imposes a duty of affirmative disclosure on "quasi-insiders". *See, e. g.*, ALI Fed. Securities Code § 1603, Revised Comment 3(d) (March 1978 Draft). "Quasi-insiders" are people who obtain nonpublic information from a source outside a corporation about events or circumstances which will affect the market in the corporation's stock. An example of a "quasi-insider" would be a Federal Reserve Bank employee who trades with knowledge of an upcoming change in margin rate.

A financial columnist who trades with knowledge that a favorable article about a particular company is soon to be published is in the position of a "quasi-insider". Commentators have analyzed the case now before us, in its earlier stages, as posing the issue of Campbell's duty to disclose the forthcoming publications of his article about ASI before trading in ASI stock. *See* Fleischer, Mundheim & Murphy, An Initial Inquiry into the Responsibility to Disclose Market Information, 121 U.Penn.L.Rev. 798, 828–34 (1973); *see also* Peskind, Regulation of the Financial Press: A New Dimension to Section 10(b) and Rule 10b–5, 14 St. Louis U.L.Rev. 80, 92–96 (1969).

**10.** The Investment Advisers Act of 1940 provides:

"'Investment adviser' means any person who, for compensation, engages in the business of advising others, either directly [or indirectly] or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or *selling securities, or who, for compensation* and as part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include * * * (D) the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation * * *." 15 U.S.C. § 80b–2(a)(11).

Because the issue is not properly before us, we need not decide whether a financial columnist for a newspaper of general circulation *can ever be considered an investment adviser* for the purposes of the Investment Advisers Act of 1940. *See S. E. C. v. Wall Street Transcript Corp.*, 422 F.2d 1371, 1377 n.10 (2d Cir.), *cert. denied*, 398 U.S. 958, 90 S.Ct. 2170, 26 L.Ed.2d 542 (1970); Loomis, The Securities Exchange Act of 1934 and the Investment Advisers Act of 1940 Release No. 1A–563 (Jan. 14, 1977), 42 Fed.Reg. 2953. And for the same reason, we need not await the Supreme Court's decision on whether a private right of action should be implied from the Investment Advisers Act. *Lewis v. Transamerica Corp.*, 575 F.2d 237 (9th Cir.), *cert. granted*, —— U.S. ——, 99 S.Ct. 348, 58 L.Ed.2d 343 (1978).

vide different means to curb slightly different types of "fraud or deceit".[11]

A number of cases since *Capital Gains* suggest that Rule 10b–5 requires the disclosure of conflicts of interest in situations similar to the facts of this case. In *Chasins v. Smith, Barney & Co., supra,* the court held that a brokerage firm had the duty to disclose its "market making" activities in certain stocks to a client who purchased those stocks on the firm's recommendation. The court upheld a judgment for damages suffered by the client, on the ground that the firm's failure to inform the customer of the possible conflict of interest was an omission of a material fact in violation of Rule 10b–5.

The court's holding in *Chasins* could be interpreted narrowly, as imposing a duty to disclose conflicts of interest only upon brokers acting within a traditional broker-client relationship. However, the Supreme Court's opinion in *Affiliated Ute Citizens of Utah v. United States, supra,* illustrated that this duty may be imposed on others as well.

The plaintiffs in *Affiliated Ute Citizens* were former shareholders in the Ute Distribution Corporation (UDC), a corporation formed as part of a plan to distribute the assets of the Ute Indian Tribe among its mixed-blood and full-blood members. Upon its formation, UDC had issued 10 shares of stock in the name of each mixed-blood member and then appointed a Utah bank to act as the UDC stock transfer agent. The plaintiffs sued the bank and two of its employees under Rule 10b–5 when they learned that the bank employees had promoted and participated in sales of Indians' shares to non-Indian buyers at a price that the employees knew was well below the market value of the securities.

We find Campbell's activities sufficiently similar to those of the bank employees in *Affiliated Ute Citizens* to impose on him a duty to disclose to his readers his stock ownership, his intent to sell when the market price rose, and the practice of reprinting his articles. Columnists, like transfer agents, ordinarily have no duty to disclose facts about their personal financial affairs or about the corporations on which they report. But there are instances in which Section 10(b) and Rule 10b–5 require disclosure. Here, as in *Affiliated Ute Citizens,* the defendant assumed those duties when, with knowledge of the stock's market and an intent to gain personally, he encouraged purchases of the securities in the market. Campbell should have told his readers of his stock ownership, of his intent to sell shares that he had bought at a discount for a quick profit, and of the practice of having his columns reprinted verbatim as advertisements in the financial journal in which he had an interest.[12]

Our decision conforms to the "flexible duty" standard enunciated by this court in *White v. Abrams,* 495 F.2d 724 (9th Cir. 1974). There, this court held that the following factors are relevant in determining the scope of the duty to disclose material facts under Rule 10b–5: (1) the relationship of defendant to plaintiff; (2) defendant's access to the information as compared to that of plaintiff; (3) defendant's benefit derived from the relationship; (4) defendant's awareness of whether plaintiff was relying on their relationship in making his or her investment decisions; and (5) defendant's activity in initiating the transaction in question. 495 F.2d at 735–36.[13]

While seemingly addressed to the usual "insider" situation, in which the undisclosed information concerns the inherent value of the firm, the factors in the *White v.*

---

**11.** For a prescient discussion of this issue, *see Peskind, supra* n.9, at 86–88.

**12.** If liability is established at trial, the damages would be measured by the difference between the value paid to RGC on the merger and the value that would have been paid if Campbell had revealed these material facts in his column.

**13.** Although *White v. Abrams* has been overruled insofar as it contemplated liability without scienter (*Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)), its approach to the duty question is otherwise the law of this circuit. *See Crocker-Citizens Nat'l Bank v. Control Metals Corp.,* 566 F.2d 631, 636 n.2 (9th Cir. 1977).

*Abrams* test are also applicable to Campbell's nondisclosure to his readers of his financial interest in the ASI market. His relationship to the public was not a fiduciary one under common law, but that is not dispositive of the Rule 10b–5 claim. *Compare Santa Fe Industries v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (no rule 10b–5 violation despite alleged violation of state law fiduciary duties), *with Affiliated Ute Citizens of Utah v. United States, supra* (no ordinary state law duties, but Rule 10b–5 duty violated). Campbell was an informal financial adviser in a medium that the plaintiffs offer to prove influenced the market for ASI stock. He controlled the information that he owned the stock and intended to sell, and he kept those facts secret. As a salaried columnist for a large newspaper, he benefited from his relationship with his readers, on whom his employment ultimately depended. Zweig and Bruno have offered to prove that his column initiated many of the stock transactions that caused the quick rise in the stock's price. Hence, under the *White v. Abrams* approach, Campbell's duty to his readers is well established.

■ In order for Campbell to be liable to nonreaders Zweig and Bruno, however, a further duty must be shown. To recover damages, these plaintiffs must prove that Campbell owed them a duty. They must show that they were in a relationship with Campbell similar to his readers' relationship with him. We believe that RGC, and its shareholders Zweig and Bruno, were in a position similar to that of Campbell's readers. RGC and the readers had strikingly similar stakes in the processes of the market.

At the time the Campbell column was published, RGC had already contractually committed itself to sell its assets to ASI. ASI agreed to pay at a future date stock worth $1,800,000 for the RGC assets. The number of ASI shares was to be fixed by the market value of ASI stock on given dates. In making this deal, RGC relied on the existence of an honest market. A market presumes the ability of investors to assess all the relevant data on a stock, including the credibility of those who recommend it, in creating a demand for that stock.

In effect, RGC in good faith placed its fate in the hands of market investors, including Campbell's readers. RGC relied on the forces of a fully informed market. Instead, it was forced to sell in a manipulated market. If Campbell was unaware of RGC's reliance on the market, he could have discovered it with minimal effort by asking ASI or RGC about the terms of the merger, or by checking the reorganization agreement that had been signed several months before. RGC was a foreseeable plaintiff.

Furthermore, the more readers the Campbell column influenced, the greater the distortion of the market. As the price of ASI stock rose, the added losses caused by the deception did not fall upon the readers, but shifted to RGC. Each reader who bought into ASI at the inflated price reduced the number of shares that ASI would have to issue to RGC in the merger. The more shares the readers bought in reliance on Campbell, the less real value the ASI shareholders as a whole had to give up in the merger, and the more RGC had to absorb the adverse effects of the deception. In this unusual situation, the duty Campbell owed his readers must also extend to RGC.

To illustrate the point, one can assume (as we must on summary judgment) that the plaintiffs can prove that the average market price of ASI stock would have been $3.25 per share without Campbell's column, or with a column that fully disclosed all material facts. This means that the 500,000 outstanding shares of ASI stock would have been worth about $1,625,000 in the marketplace. It follows that about $1,625,000 is what a free market would have considered the ASI operation to be worth.[14] Meanwhile, both parties to the merger agreed in arm's length dealings that RGC was worth $1,800,000; thus, the combined ASI–RGC

---

14. For a note on the correlation between the value of a firm's securities and that of its assets, *see* V. Brudney and M. Chirelstein, Corporate Finance, 77–81 (1972).

operation would be worth, in an unmanipulated market, about $3,425,000.

Zweig and Bruno have charged (and we must assume) that as a result of Campbell's manipulation of the market, the price of ASI stock rose to an average of $4.35 per share on the crucial dates prior to the closing of the merger. This meant that instead of receiving more than 540,000 newly issued shares of ASI,[15] RGC received only 413,793. Instead of owning roughly 52 per cent of the combined enterprise, RGC became merely a minority shareholder in ASI. It follows that the ASI shareholders, including Campbell and his readers who bought, came to own nearly 55 per cent of the combined enterprise (by having 500,000 of 913,793 shares) instead of the 48 per cent they would have owned if the market had been free from Campbell's manipulation. The ASI shareholders would have kept their 500,000 shares even in a true market, but they would have had to issue more than 540,000 new shares to RGC.

Thus, Campbell's readers, who paid an average of $4.35 per share, received, as well as paid, more than what the fair market value of the ASI stock would have been if there had been no manipulation. Because of the fortuitous circumstances of the terms of the ASI–RGC merger, the purchasers in the market received shares of an inflated participation by ASI in the combined enterprise. ASI's participation in the merged companies turned out to be about 55 per cent of the shares, and thus 55 per cent of the $3,425,000 in assets, or about $1,870,000. By this reckoning, the pre-existing 500,000 shares of ASI turned out to be worth about $3.75 each in true asset value. The difference between $3.75 and the $3.25 that a fair

market would have paid for each share was, in effect, paid by RGC. Campbell's readers would not have a claim against Campbell for this portion of the price inflation, because they did not bear the full brunt of the deception practiced on them. Part of the loss was borne instead by RGC, a fortuitous innocent bystander that had entrusted its assets to the market in the underlying merger plan.

If more readers had relied on Campbell, RGC would have absorbed even more losses caused by the deception. Had the market risen to $4.65 per share for ASI, ASI's participation in the $3,425,000 enterprise would have been more than 56 per cent. The readers would have paid $1.40 more than each share was truly worth, but RGC would have picked up 61 cents per share of the loss by getting an even smaller participation in the combined companies.

We are aware that in traditional common-law terms it is difficult to make out a duty owed by Campbell to a corporation that did not, and could not, have read his writings before deciding to purchase ASI stock. But if there had been no RGC merger planned, Campbell would be liable to his readers for losses caused by the $1.10 per share temporary inflation that we must assume was caused by his column. In the unusual fact setting here, someone else, a purchaser of ASI stock that relied on the free and unmanipulated market that the federal securities laws were designed to foster, absorbed part of that loss. That forced purchaser should not be required, in effect, to pay Campbell's damages for him. We believe it fully consistent with the spirit and letter of the securities laws to impose upon Campbell a duty to RGC.[16] As we

---

**15.** At $3.25 per share, the number of shares issued to RGC would have been 553,846, or 52.6 per cent of the joint enterprise. The parties to the merger had agreed, however, that a minimum price for ASI stock would be $3.33 per share; thus, the maximum number of shares that could have been issued to RGC was 540,540, or 51.9 per cent of the combined companies.

**16.** Our reasoning is consistent with that of the many cases in which receivers and givers of

inside tips have been held liable for violations of Section 10(b) and Rule 10b–5. When a corporate insider gives a tip, even if he or she does not gain from the transaction that results, and even if the receiver of the tip has no fiduciary duty to the plaintiff, the congressional concern for the integrity of the marketplace compels liability. *See, e. g., S. E. C. v. Texas Gulf Sulphur, supra.* Even outsiders to a corporation can be held criminally liable under the federal securities laws for improperly influencing the market for the corporation's shares.

have illustrated, to extend the obligation of disclosure to the readers but to bar RGC from recovery under the rubrics of reliance or duty would lead to a wholly incongruous result: the more effective Campbell was in elevating the price of the stock for his own benefit, the greater the losses an innocent third party (RGC) would have to absorb.

### IV. *Conclusion*

■ The other aspects of this cause of action require but brief comment. The Supreme Court has held that Rule 10b–5 will not support a private action for damages in the absence of an allegation of scienter. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Here, Campbell knew the material facts he failed to reveal. Moreover, there is at the very least a triable issue of fact as to whether Campbell intended to benefit from the column, from which he intentionally omitted any mention of his financial interests. And as the Supreme Court noted in *Affiliated Ute Citizens, supra,* when a Rule 10b–5 action is based on nondisclosure, causation of harm is sufficiently proved by a showing of materiality. 406 U.S. at 154, 92 S.Ct. 1456; *see Blackie v. Barrack,* 524 F.2d 891, 906–07 (9th Cir. 1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d at 238–41. Thus, we believe the court below should presume on remand that the public purchases of ASI stock that followed the republication of the article were in reliance on it. RGC did not rely specifically on Campbell or his column, but it did rely on the natural process of the market. That market included Campbell's readers, who must be presumed to have relied on his making a full and frank disclosure. We hold that these two legitimate expectations constitute sufficient reliance to establish liability in this case.

While Rule 10b–5 should not be extended to require every financial columnist or reporter to disclose his or her portfolio to all

of his or her readers, it does cover the activities of one who uses a column as part of a scheme to manipulate the market and deceive the investing public. On the record in this case there were material questions of motive and method that should be resolved in a trial.

The court below asserted that it saw no harm or impropriety in a columnist's "making a nickel" at the same time he tells his readers of what may truly appear to him to be an enterprise with a bright future. The trial court was apprehensive that compelling disclosure of financial interest in such a situation would provide a disincentive to columnists to report on the merits of worthy companies. This observation is true, but it proves too much. If brokers were permitted to make secret profits by self-dealing in the market, they too would be stimulated to find better stocks, in which they could invest personally while passing along the advice to their customers. Moreover, the judgment of corporate directors and officers and controlling shareholders might similarly be spurred if they could expect short-swing profits in the markets for the stocks of the companies they manage. But the federal securities laws, in guarding the public from abuses, strictly circumscribe the opportunities of persons holding certain positions to profit from their positions. We hold that these laws also require a financial columnist, in recommending a security that he or she owns, to provide the public with all material information he or she has on that security, including his or her ownership, and any intent he or she may have (a) to score a quick profit on the recommendation, or (b) to allow or encourage the recommendation to be published as an advertisement in his or her own periodical.

Reversed and remanded.

ELY, Circuit Judge (Dissenting):

I respectfully dissent. I agree that causation and reliance may, in certain circum-

---

*See United States v. Charnay,* 537 F.2d 341 (9th Cir.), *cert. denied,* 429 U.S. 1000, 97 S.Ct. 527, 50 L.Ed.2d 610 (1976). In *Charnay,* a criminal indictment charging outsiders with Rule 10b–5

violations was upheld despite an unusual factual setting that presented issues of first impression.

**1272**

stances, be inferred from materiality. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). But it is also clear that "affirmative evidence of non-reliance may defeat this inference." *Crocker-Citizens National Bank v. Control Metals Corp.*, 566 F.2d 631, 636 n. 3 (9th Cir. 1977). The record plainly shows that the appellants' decision to acquire ASI stock, embodied in the merger agreement between ASI and RGC, predated the publication of Campbell's column by several months. Thus, it is, as I see it, *impossible* that a causal relationship could exist between Campbell's wrongful conduct and the appellants' decision to invest. There was not even the possibility of reliance upon Campbell's column in connection with the execution of the merger agreement by the appellants. In these circumstances, we surely have compelling "affirmative evidence of nonreliance", evidence that should thoroughly negate any inference of causation and reliance.

While I agree that Campbell's alleged conduct was reprehensible, the District Court rightly concluded that he was not liable to the appellants in this case. The majority effectively removes the substantive content in the requirement of "in connection with" when it holds that Campbell may be liable in damages under Rule 10b–5 to individuals who decided to acquire stock and executed a merger agreement months before the wrongful conduct occurred. *Cf. Raschio v. Sinclair*, 486 F.2d 1029, 1030 (9th Cir. 1973) (purchase of stock approximately two months before alleged Rule 10b–5 violation). Sincerely believing that my Brothers stretch section 10(b) and Rule 10b–5 beyond their breaking point, I would affirm.